UNITED STATES, Appellee

v.

Richard J. ASHBY, Captain
U.S. Marine Corps, Appellant

No. 08-0770

Crim. App. No. 200000250

United States Court of Appeals for the Armed Forces

Argued June 24, 2009

Decided August 31, 2009

ERDMANN, J., delivered the opinion of the court, in which
GOODWIN, J., and COX, and GIERKE, S.JJ., joined.  STUCKY, J.,
filed a separate concurring opinion.  EFFRON, C.J., and BAKER
and RYAN, JJ., did not participate.


Counsel

For Appellant:  Lieutenant Dillon J. Ambrose, JAGC, USN
(argued); Lieutenant Kathleen L. Kadlec, JAGC, USN (on brief).

For Appellee:  Lieutenant Commander Paul D. Bunge, JAGC, USN
(argued); Colonel Louis J. Puleo, USMC, and Brian K. Keller,
Esq. (on brief).

Military Judge:  A. W. Keller

**This opinion is subject to revision before final publication.**

United States v. Ashby, No. 08-0770/MC

Judge ERDMANN delivered the opinion of the court.[1]

Appellant, Captain (Capt.) Richard J. Ashby, United States Marine Corps Reserve, was the pilot of an EA-6B Prowler aircraft conducting a training mission in the Italian Alps on February 3, 1998. The Prowler's crew consisted of Ashby, Capt. Joseph P. Schweitzer, who was the navigator for this mission and Ashby's co-accused, and two additional electronic countermeasures officers. Late in the mission the aircraft was flying at low-levels and struck weight-bearing cables of the Aple Cermis cable car system. As a result, a descending cable car carrying twenty individuals from various nations fell over 300 feet to the ground. All twenty passengers in the cable car were killed. Despite the damages that were inflicted upon the aircraft, Ashby piloted it to a successful emergency landing at the North Atlantic Treaty Organization (NATO) air base in Aviano, Italy.

Ashby ultimately faced two general courts-martial. At the first court-martial he was acquitted by members of all charged offenses including dereliction of duty, negligently suffering

---

[1] Chief Judge Andrew S. Effron, Judge James E. Baker, and Judge Margaret A. Ryan recused themselves from this case and did not participate in this opinion. Judge Joseph R. Goodwin, Chief Judge of the United States District Court for the Southern District of West Virginia, sat by designation, pursuant to Article 142(f), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 942(f) (2006). Senior Judge Walter T. Cox III, and Senior Judge H. F. "Sparky" Gierke participated in this case pursuant to Article 142(e)(i)(A)(iii), UCMJ, 10 U.S.C. § 942(e)(1)(A)(iii) (2006).

military property to be damaged, recklessly damaging nonmilitary property, involuntary manslaughter, and negligent homicide. After the original charges had been referred, but before trial, it was discovered that a videotape taken during the flight had been concealed and eventually destroyed. A separate charge alleging two violations of Article 133, UCMJ, 10 U.S.C. § 933 (2000), conduct unbecoming an officer and a gentleman, was preferred. The convening authority directed that the Article 133, UCMJ, charge be tried in conjunction with the original charge. At his initial trial, however, Ashby refused to consent to the joinder of the Article 133, UCMJ, charge and it was withdrawn by the convening authority. The Article 133, UCMJ, charge was subsequently referred to a separate court-martial.

At his second court-martial Ashby was convicted by members of two specifications of conduct unbecoming an officer and a gentleman in violation of Article 133, UCMJ, for obstruction of justice and conspiring to obstruct justice. He was sentenced to six months of confinement, forfeiture of all pay and allowances, and dismissal from the service. The convening authority approved the sentence and, after remand[2] and a new staff judge advocate (SJA) recommendation and action, the United States Navy-Marine Corps Court of Criminal Appeals affirmed the

---

[2] United States v. Ashby, No. NMCCA 200000250, 2007 CCA LEXIS 235, 2007 WL 1893626 (N-M. Ct. Crim. App. June 27, 2007).

findings and sentence.  United States v. Ashby, No. NMCCA
200000250, slip op. at 4, (N-M. Ct. Crim. App. June 17, 2008)
(per curiam).  We granted review of all nine issues submitted by
Ashby to this court.  Following a careful review of the asserted
issues, we affirm the Court of Criminal Appeals.

BACKGROUND

The circumstances underlying the two Article 133, UCMJ,
offenses commenced after Ashby had successfully made the
emergency landing at the NATO airbase in Aviano, Italy.  The
pertinent facts were summarized as follows by the Court of
Criminal Appeals in its first opinion in this case:

> The evidence at trial was largely undisputed
> as to what took place immediately before and
> after this tragic aviation disaster.  Capt
> Schweitzer borrowed the appellant's video camera
> for the mishap flight.  It was to be his last
> flying mission prior to leaving active duty, and
> he desired to have a remembrance that would
> document for friends and family what he did as a
> naval flight officer.  Record at 928; 1272-74.
> As Capt Schweitzer explained:
>
>> I asked [Capt Ashby] over the weekend
>> if I could borrow [the video camera].
>> Basically I wanted to take some low
>> level -- not low level, but footage of
>> basically how we were flying.  It was
>> the last week we were going to be
>> there.  I was getting out in June, and
>> I wanted to have something to have so I
>> could show my friends, my kids, and
>> say, hey, this is what your dad
>> did. . . .
>
> Id. at 928.  Before the flight, Capt Schweitzer
> purchased a pack of two blank tapes.  With the

appellant's assistance, he loaded one of the tapes during the flight and shot video footage during three separate legs of their six-legged mission. Record at 931-32. Capt Schweitzer claimed at trial that the camera was not in use at the time of the mishap, which occurred on the last leg of the mission. Id. at 932, 980.

After the cable strike, the crew was well aware that their aircraft was seriously damaged and that, under the best circumstances, an emergency landing at the NATO air base in Aviano would be required. They also feared they might have to eject from the aircraft. After successfully executing an arrested landing at the Aviano air base, the two aft crewmembers immediately executed an emergency egress from the aircraft in accordance with standard mishap protocol. Before exiting the aircraft, Capt Raney, who was in the aft cockpit, overheard someone he believed was the appellant asking "Is it blank?" Id. at 1173; 1287-88. The appellant and Capt Schweitzer, did not egress the aircraft, but instead elected to remain in the forward cockpit discussing what to do with the recorded videotape.

Knowing that their aircraft would be immediately impounded and inventoried due to the mishap, and seeking not to have the recorded videotape "become an issue" during the investigation they knew was forthcoming, Capt Schweitzer ultimately told the appellant, "Let's take the tape." Record at 935, 1293, 1295; Prosecution Exhibit 2 at 1. Though both were uncertain of everything depicted on the videotape, Capt Schweitzer was aware that the tape, at a minimum, showed the mishap aircraft executing a flaperon roll [n5] during a ridgeline crossing on the first leg of the flight, and, in a separate segment, contained a scene of him smiling into the video camera while holding it in the air and pointing it back at himself. Record at 938, 939. Capt Schweitzer handed the appellant the video camera, and the appellant removed the recorded tape and substituted in its place a new and unused tape. Id. at 935, 1294; PE 2 at 1-2. The appellant then placed the recorded tape in his flight suit pocket

and exited the aircraft, leaving behind the video camera loaded with the unrecorded tape, along with the camera's carrying bag. Record at 936, 1294; PE 2 at 2. The recorded videotape remained in the appellant's possession during the next few days (4 to 6 February 1998), during which he and the other crewmembers learned that 20 people had died as a result of their flight mishap, that the Italian government had initiated a criminal investigation into the matter, that Italian and military defense counsel had been hired/detailed to represent the crewmembers, and that a "Command Investigation Board" (CIB) [n6] had been convened by the Marine Corps to look into the facts and circumstances concerning their flight.

[FOOTNOTES]

[n]5 A flaperon roll is a 360-degree twisting maneuver about the long axis of the aircraft, often performed during ridgeline crossings.

[n]6 A CIB is one of several authorized methods specified in the Manual of the Judge Advocate General for investigating significant operational or training mishaps that involve loss of life and/or significant property damage. See § 0208, Manual of the Judge Advocate General (JAGMAN), JAG Instruction 5800.7D (15 March 2004). At the time of this incident, the CIB procedures and guidance were contained in § 0209 of the JAGMAN, JAG Instruction 5800.7C (03 October 1990).

[——————]

Three to four days after the mishap (on or about 07 February 1998) the appellant was walking from the mess hall with Capt Schweitzer and Capt Seagraves. When Capt Schweitzer described the recorded videotape to Capt Seagraves and asked his opinion as to what they should do with it, Seagraves responded, "I would get rid of it" or words to that effect. Record at 937. This statement was made in the appellant's presence. Later, fully aware that the videotape contained footage of his inverted ridgeline crossing and other segments of the mishap flight, and worried

that such would be "misinterpreted" by investigators, the appellant gave the videotape to Capt Schweitzer, who subsequently destroyed it by throwing it into a bonfire. Id. at 938-40, 950, 1299. The appellant was advised of the tape's destruction by Capt Schweitzer shortly thereafter. Id. at 950. The existence and destruction of this videotape only came to the attention of military investigators in August 1998, once Capt Seagraves received testimonial immunity and elected to disclose "the truth about everything." Id.

Ashby, 2007 CCA LEXIS 235, at *9-*13, 2007 WL 1893626, at *2-*3 (footnote omitted).

The circumstances surrounding the removal, concealment and eventual destruction of the videotape resulted in two specifications alleging conduct unbecoming an officer and a gentleman under Article 133, UCMJ. The first specification alleged that Ashby engaged in conduct unbecoming an officer and a gentleman by wrongfully conspiring with Schweitzer to obstruct justice by endeavoring to impede an investigation. The second specification alleged that Ashby engaged in conduct unbecoming an officer and a gentleman by wrongfully endeavoring to impede an investigation by secreting and/or destroying evidence. Additional facts will be set forth in our discussion of the individual issues as necessary.

DISCUSSION

I.

WHETHER THE LOWER COURT ERRED IN HOLDING THAT THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT A

> CONVICTION UNDER ARTICLE 133, UNIFORM CODE OF MILITARY
> JUSTICE (UCMJ), FOR OBSTRUCTION OF JUSTICE OR
> CONSPIRACY TO OBSTRUCT JUSTICE.

In reviewing for the legal sufficiency of evidence, we take the facts in the light most favorable to the Government and ask whether those facts would permit a reasonable factfinder to find all the elements of the charged offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Turner, 25 M.J. 324, 324-25 (C.M.A. 1987). We review questions of legal sufficiency de novo. United States v. Chatfield, 67 M.J. 432, 441 (C.A.A.F. 2009).

The Court of Criminal Appeals determined that the direct and circumstantial evidence supported findings that (1) Ashby had reason to believe that there was or would be a criminal investigation or proceeding following the mishap, and (2) Ashby acted with the specific intent to obstruct the due administration of justice.[3]

---

[3] In support of these conclusions the lower court noted the following: (1) Ashby's statements to the Supervisor of Flight at Aviano Air Base indicated that Ashby was aware of what he had hit, where he had hit it, and that serious concerns would be raised regarding the manner in which the flight was conducted; (2) Ashby and Schweitzer remained in the cockpit immediately after landing to discuss the contents of the videotape and what to do with it, while their fellow crewmembers immediately exited the aircraft pursuant to protocol; (3) Ashby and Schweitzer substituted a blank tape in the camera, left the camera in the aircraft, and took the recorded tape with them; (4) Ashby testified during his first court-martial that the reason they replaced the recorded tape with a blank one was because they knew that they would be subject to an AMB [Aircraft Mishap

8

Before this court Ashby argues that the elements of obstruction of justice were not met by the evidence presented by the Government. Specifically, he asserts that a criminal proceeding was not reasonably foreseeable when he removed the videotape from the aircraft, and at worst, he subjectively believed that an administrative investigation might occur. Ashby also contends that there was insufficient evidence that he formed the specific intent to impede a criminal proceeding. He further argues that the evidence did not sufficiently establish an agreement between himself and Schweitzer to obstruct justice, where he "merely acceded to authority when he relinquished the videotape," and did not believe that the tape would be evidence in a criminal proceeding.

The Government responds that given the nature of the mishap and the actions of the two coconspirators during the charged time period, there was sufficient evidence supporting both of

---

Board] and would have to answer some questions; (5) Ashby learned on February 4, 1998, that he was under investigation by the Italian authorities and realized at that time that some other investigation may be initiated; (6) Schweitzer lacked candor with his squadron commander regarding whether the video camera had been used during the mishap flight; (7) Schweitzer's testimony established that Ashby, with full knowledge of the ongoing Italian and CIB investigations (which could result in the preferral of criminal charges), heard and acceded to the recommendation of Capt. Seagraves to get rid of the videotape; and (8) Schweitzer testified that Ashby gave him the tape to "get rid of it," Ashby was in agreement with him to destroy the tape, and he destroyed the tape with the specific intent to impede the Italian investigation. Ashby, 2007 CCA LEXIS 235, at *22-*32, 2007 WL 1893626, at *6-*10.

Ashby's convictions.  The Government urges that it is unrealistic to believe Ashby was unaware that a criminal investigation would be forthcoming at the time of his misconduct.

In analyzing this issue, we consider the elements of Article 133, UCMJ, conduct unbecoming an officer and a gentleman, as well as the elements of the underlying offenses, Article 134, UCMJ, 10 U.S.C. § 934 (2000), obstruction of justice and Article 81, UCMJ, 10 U.S.C. § 881 (2000), conspiracy.  We recently reaffirmed that the criminal conduct sought to be punished by an Article 133, UCMJ, offense is the act of committing dishonorable or compromising conduct, regardless of whether the underlying conduct constitutes an offense under the UCMJ.  United States v. Conliffe, 67 M.J. 127, 132 (C.A.A.F. 2009) (quoting United States v. Giordano, 15 C.M.A. 163, 168, 35 C.M.R. 135, 140 (1964)).  Here, however, the Government chose to charge the Article 133, UCMJ, offense of conduct unbecoming an officer and a gentleman by incorporating the separate offenses of obstruction of justice and conspiracy, and the military judge instructed the panel on the elements of all three offenses.  Where the Government chooses to incorporate separate offenses into the Article 133, UCMJ, charge and where the military judge has instructed on the elements of those offenses, we will analyze the legal sufficiency of the Article

10

133, UCMJ, offense by determining whether there was legally sufficient evidence supporting all of the elements instructed upon by the military judge.

The elements of Article 133, UCMJ, are: (1) the accused did or omitted to do certain acts; and (2) under the circumstances, these acts or omissions constituted conduct unbecoming an officer and gentleman. Manual for Courts-Martial, United States pt. IV, para. 59.b (2008 ed.) (MCM).

The elements of obstruction of justice are: (1) the accused wrongfully did a certain act; (2) he did so in the case of a person against whom he had reason to believe that there was or would be criminal proceedings pending; (3) he did so with the intent to obstruct the administration of justice; and (4) under the circumstances, the accused's conduct was prejudicial to good order and discipline in the armed forces or was service discrediting. MCM pt. IV, para. 96.b.

The elements of conspiracy to obstruct justice are: (1) the accused entered into an agreement with another person to obstruct justice; and (2) while the agreement continued to exist, and while the accused remained a party to the agreement, the accused or his coconspirator performed an overt act for the purpose of bringing about the object of the conspiracy. MCM pt. IV, para. 5.b.

It is important to note that the time period of the two charged specifications was not limited to February 3, 1998, the date of the incident, but rather extended from that date through March 14, 1998, well after the date of the tape's destruction. Therefore our review of the evidence as to Ashby's subjective belief regarding a possible criminal investigation is not limited to the date of the incident. We find that the evidence is clearly sufficient to support Ashby's convictions.

Evidence which supports a finding that Ashby had reason to believe that there would be a criminal proceeding pending against him when he removed the tape from the aircraft includes: (1) testimony that the plane was badly damaged and required an emergency landing after striking something; (2) Ashby's statements during a telephone conversation shortly after the incident indicating that he believed that they may have struck a tower cable that went to a gondola and that they would get "drilled really hard" for it; (3) testimony that Ashby and Schweitzer not only took the recorded tape with the intent to watch it before handing it over to the authorities, but replaced it with a blank tape; (4) Schweitzer's admission that he acted with an intent to deceive when he left the camera containing a blank tape in the plane; and (5) Ashby's admission that it was wrong to take the videotape and that he did so because he wanted to view it before anyone else viewed it and could "nitpick" it.

There is additional evidence from the period of time that commenced when Ashby secreted the tape in his quarters until the time that Schweitzer destroyed the tape that supports a finding that Ashby had reason to believe that there was or would be criminal proceedings against him.[4] This includes evidence that: (1) on February 3, 1998, shortly after the incident, Ashby and Schweitzer learned that twenty people had been killed; (2) Ashby and Schweitzer learned as early as February 4, 1998, that they were under criminal investigation by the Italian authorities; (3) Schweitzer gave his commanding officer the impression that they had not used the camera during the flight; and (4) Ashby admitted that he feared going to an Italian jail as early as February 4, 1998. Based on the above evidence, a reasonable factfinder could have found all of the elements of obstruction of justice were met in this case.

With regard to the offense of conspiracy, a reasonable factfinder also could have found beyond a reasonable doubt that

---

[4] Ashby urges that we adopt the holding in United States v. Gray, 28 M.J. 858, 861 (A.C.M.R. 1989), which held that an official act or investigation must be manifest before an accused can be found guilty of obstruction of justice. The holding in Gray is not only contrary to the language of the MCM, which requires only proof that the accused had reason to believe that there was or would be criminal proceedings pending, it is contrary to this court's precedent. See United States v. Barner, 56 M.J. 131, 136 (C.A.A.F. 2001) ("[O]bstructing justice can occur where the appellant 'believed that some law enforcement official of the military . . . would be investigating his actions.'") (citation omitted).

Ashby agreed with Schweitzer to obstruct justice in a criminal proceeding and committed an overt act in furtherance of that agreement. Ashby and Schweitzer remained in the cockpit together after the other two crewmembers had evacuated the aircraft in accordance with protocol. They discussed what to do with the videotape, and Schweitzer told Ashby he thought they should take the tape. Ashby then removed the tape, replaced it with a blank one, and took the recorded tape with him when he left the aircraft. Ashby kept the tape in his quarters and did nothing with the tape until Schweitzer approached him about it several days later. After discussing what to do with the tape, Ashby eventually gave it to Schweitzer knowing that he was going to get rid of it. There is no evidence in the record which compels the conclusion that Ashby merely acceded to Schweitzer's authority in handing over the videotape. We hold that the evidence presented at trial supports a finding that all of the elements of conspiracy were met.

Finally, with regard to the elements of Article 133, UCMJ, there is legally sufficient evidence that Ashby committed the charged acts, as discussed above. There also is abundant evidence supporting a conclusion that, under the circumstances, Ashby's acts or omissions constituted conduct unbecoming an officer and a gentleman. Ashby himself admitted that his actions in taking the videotape and failing to hand it over to

14

the authorities were wrongful.  As a captain in the United

States Marine Corps who was the pilot of an aircraft that had

been involved in an international incident which caused the

deaths of twenty civilians, Ashby's conduct in concealing

potential evidence and assisting in its destruction was clearly

conduct unbecoming an officer and a gentleman.

II.

WHETHER THE LOWER COURT ERRED IN AFFIRMING THE
MILITARY JUDGE'S DECISION TO EXPAND THE TERM "CRIMINAL
PROCEEDING" TO INCLUDE OBSTRUCTION OF FOREIGN CRIMINAL
PROCEEDINGS.

Obstruction of justice underlies both of Ashby's

convictions for conduct unbecoming an officer and a gentleman.

As discussed above, the members were instructed that they must

find that Ashby's conduct met all of the elements of the offense

of obstruction of justice as well as the elements of the offense

of conduct unbecoming an officer and a gentleman.  One of the

elements of obstruction of justice under Article 134, UCMJ, is

that the accused knew or had reason to know that there would be

"criminal proceedings" pending.  MCM pt. IV, para. 96.b.(2).

The MCM does not define "criminal proceedings," but does

provide:

Examples of obstruction of justice include wrongfully
influencing, intimidating, impeding, or injuring a
witness, a person acting on charges under this
chapter, an investigating officer under R.C.M. 406, or
a party; and by means of bribery, intimidation,
misrepresentation, or force or threat of force

15

> delaying or preventing communication of information relating to a violation of any criminal statute of the United States to a person authorized by a department, agency, or armed force of the United States to conduct or engage in investigations or prosecutions of such offenses; or endeavoring to do so.

MCM pt. IV, para. 96.c.

Prior to trial, the military judge denied Ashby's motion in limine to prevent the Government from arguing that the act of obstructing a foreign criminal investigation could support a charge of obstruction of justice. The military judge ruled that foreign criminal proceedings would fall under the definition of "criminal proceedings" in the MCM if the Government showed that the actions of the accused in obstructing such proceedings were directly prejudicial to good order and discipline or service discrediting. Ultimately, the military judge instructed the panel that the term "criminal proceedings" includes:

> obstruction of foreign criminal proceedings or investigations when such obstruction of the criminal proceedings or investigation have a direct impact upon the efficacy of the United States criminal justice system by being directly prejudicial to good order and discipline in the Armed Forces or being directly discreditable to the Armed Forces.

In this assignment of error, Ashby argues that it is an unwarranted expansion of the term "criminal proceedings" to include foreign criminal proceedings. He argues that such an interpretation is contrary to both a plain reading of MCM pt. IV, para. 96, which contemplates obstruction of justice only in

16

the context of a United States criminal statute or investigation, as well as the body of case law on the subject. The Government responds that the offense of obstruction of justice should be broadly interpreted to include conduct that impedes a foreign criminal proceeding, noting that nothing in the MCM limits the scope of the offense to federal or military criminal proceedings.

The fact that the MCM discussion does not include a reference to a foreign criminal proceeding is not dispositive. The examples referenced in the MCM discussion are merely illustrative, not exclusive. See MCM pt. IV, para. 60c(6)(c): "If conduct by an accused does not fall under any of the listed offenses for violations of Article 134 in this Manual . . . a specification not listed in this Manual may be used to allege the offense." Because neither Article 133, UCMJ, nor Article 134, UCMJ, expressly prohibit charging an obstruction of a foreign investigation, the question becomes whether Ashby had sufficient notice that his conduct could violate Article 133, UCMJ. Parker v. Levy, 417 U.S. 733, 755-56 (1974).

Due process requires that a person have fair notice that an act is criminal before being prosecuted for it. United States v. Saunders, 59 M.J. 1, 6 (C.A.A.F. 2003). The Supreme Court examined the issue of notice in the context of Articles 133, UCMJ, and 134, UCMJ, in Parker, 417 U.S. at 754-57. In

17

upholding the statutes against a constitutional challenge for vagueness, the Court noted that the statutes had been narrowed by example and that content was supplied by custom and usage. The test to be applied was articulated as:

> [v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.  In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged.

Id. at 757 (citation omitted); see United States v. Frazier, 34 M.J. 194, 198-99 (C.M.A. 1992) (the question is whether a reasonable military officer would have "no doubt" that the charged activities constituted conduct unbecoming an officer and a gentleman).

Ashby cannot fairly claim that he lacked notice of the criminality of his conduct by virtue of the absence of the inclusion of foreign criminal proceedings in the MCM. Undoubtedly, conduct of a United States military officer designed to prevent authorities of an allied foreign nation from investigating a fatal accident on its national soil involving United States military personnel may constitute conduct unbecoming an officer and a gentleman.  See, e.g., United States v. Bailey, 28 M.J. 1004, 1007 (A.C.M.R. 1989) ("It can hardly be gainsaid that it brings discredit upon the armed forces of the United States when a soldier makes false statements to foreign

18

law enforcement officials regarding an offense in which the soldier is involved with a citizen of the host country."). Here, a number of factors support the conclusion that Ashby had reasonable notice that taking the videotape from the mishap aircraft, secreting it in his quarters, and eventually providing the tape to Schweitzer to "get rid of it" was both service discrediting and conduct unbecoming an officer and a gentleman.

The NATO Status of Forces Agreement (NATO SOFA) between the United States and Italy imposes a duty on both parties to assist in carrying out investigations, collecting and producing evidence, and handing over objects related to an offense.[5] An experienced officer in Ashby's position would or should have been on notice of the NATO SOFA provisions.[6] As such, Ashby had notice that his conduct in failing to hand over a videotape that he knew would have evidentiary value in an Italian investigation violated his official duties. Notice also arises from the fact that acts of dishonesty and deceit are prohibited by illustration in both Article 133, UCMJ, and Article 134, UCMJ.

---

[5] Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Forces, Article VII, para. 6(a), June 19, 1951, 4 U.S.T. 1792, 199 U.N.T.S. 67.

[6] Although there is no direct evidence in the record that Ashby had actual knowledge of this provision of the NATO SOFA, there is no dispute that he was aware of the agreement as he acknowledged his rights under that treaty when he signed the minutes of the Italian magistrate's interrogation in the presence of his Italian counsel on February 4, 1998. Additionally, Ashby testified that he was on his second deployment to Aviano at the time of the gondola incident.

See, e.g., MCM pt. IV, paras. 59.c.(2), 77 (false pass), 78 (obtaining services under false pretenses), and 79 (false swearing).  In addition, common sense supports the conclusion that Ashby was on notice that his conduct violated the UCMJ.  We have no doubt that Ashby, as a seasoned officer and aircraft pilot, understood that under the circumstances his actions would reflect poorly upon him as an officer and would discredit the service.  We simply find nothing in the UCMJ or in the cases presented by Ashby that supports his contention that the conduct in this case cannot be sustained as conduct unbecoming an officer and a gentleman because the criminal investigation that was impeded was foreign rather than domestic or military.[7]

## III.

WHETHER THE LOWER COURT ERRED IN AFFIRMING THE MILITARY JUDGE'S DECISION TO PERMIT FAMILIES OF THE VICTIMS OF THE GONDOLA CRASH TO TESTIFY ON SENTENCING.

Over defense objection, the military judge permitted three family members of victims who died in the gondola incident to testify during the Government's case in aggravation.  The

---

[7] Our ruling today is limited to factual situation before the court -- whether an Article 133, UCMJ, conduct unbecoming an officer and a gentleman specification is legally sufficient where the conduct underlying the charge was incorporated by reference as an Article 134, UCMJ, obstruction of justice charge, and where the military judge's instruction linked the obstruction of the foreign criminal proceeding to conduct that was "directly prejudicial to good order and discipline in the Armed Forces or being directly discreditable to the Armed Forces."

military judge limited the witnesses' testimony, permitting each witness only to:  (1) identify himself or herself as a relative of one of the victims; and (2) testify that not knowing what was on the videotape had left lingering questions regarding his or her loss.  He concluded:

> I find that the proffered testimony of the three witnesses regarding their lingering questions as to what was on the videotape to be relevant.  I also find that a reasonable link exists between such testimony and the offenses before the [c]ourt.
>
> I find the probative value of such testimony to substantially outweigh the danger of unfair prejudice, confusion or delay in this trial.

The three witnesses were Georgio Vaia, Rita Wunderlich, and Emma Aurich.  Vaia testified he was the nephew of the gondola operator.  He indicated that he had learned about the missing videotape because he followed the investigation into the incident.  When asked whether he had lingering questions about the videotape, Vaia testified:

> When you have a suffering in the family, when you lose somebody who is very dear, a dear family member, however heavy that suffering may be, you try to accept what has happened; and that acceptance is very gradual, but it can be helped by knowing what has happened.

Vaia affirmed that knowing that the videotape had been destroyed had made it difficult for him to get closure.

Wunderlich testified that her forty-three-year-old husband and six of their friends were killed in the gondola accident.

She testified that she learned about the missing videotape from the press.  She testified that, as a result of knowing that a videotape had been destroyed, she had many lingering questions that "d[id] not give [her] any peace."

Aurich was the final of the three witnesses.  When asked who the members of her family were, she responded:  "I don't have anybody anymore.  They are all dead."  She affirmed that her forty-year-old son and daughter-in-law were killed in the gondola accident.  Aurich acknowledged that she learned of the missing videotape as she followed reports of the investigation.  When asked whether she had lingering questions knowing that the tape had been destroyed, she responded:  "Yes.  Yes.  I'm suffering.  It's painful, and I am suffering."  She affirmed that the lingering questions would "follow [her throughout her] whole life because [she did not] know how they will be answered."

Immediately following the above testimony, the military judge instructed the panel members:

> [Y]ou are not invited or asked to redress any wrong befalling the victims' family in this case but rather to perform your proper role as a representative of the community at large to adjudge . . . an appropriate sentence in this case.
>
> . . . [T]he conduct of the flight and the responsibility for the deaths and the damage to the aircraft have already been the subject of another proceeding and are not before you for resolution.

. . . .

> So, again, during this phase of the trial, you will not be determining a sentence based upon either the deaths or damage to the aircraft.

We review a military judge's decision on the admission of evidence in aggravation at sentencing for an abuse of discretion. United States v. Stephens, 67 M.J. 233, 235 (C.A.A.F. 2009). At sentencing, "trial counsel may present evidence as to any aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." Rule for Courts-Martial (R.C.M.) 1001(b)(4). Evidence in aggravation includes "evidence of . . . psychological . . . impact on . . . any person . . . who was the victim of an offense committed by the accused . . . ." Id. Even if admissible under R.C.M. 1001(b)(4), the evidence must pass the balancing test of Military Rule of Evidence (M.R.E.) 403. M.R.E. 403 states "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Where the military judge conducts a proper M.R.E. 403 balancing on the record, we will not overturn his ruling unless we find a clear abuse of discretion. Stephens, 67 M.J. at 235. Here the military judge performed a M.R.E. 403 balancing test and found

"the probative value of such testimony to substantially outweigh the danger of unfair prejudice, confusion or delay in this trial."

Ashby does not argue that the testimony fails to meet the requirements of R.C.M. 1001(b)(4), but does argue that admission of the evidence was an abuse of discretion because the prejudicial effect of the evidence far outweighed its probative value. He argues that the testimony was "enflaming" and unnecessarily humanized the victims, unfairly portrayed him as responsible for their deaths, and went beyond the military judge's limited mandate.

We disagree with Ashby's characterization of this testimony and conclude that the military judge did not abuse his discretion in admitting it. The military judge recognized the possible prejudicial effect of the testimony and substantially limited it to include only the effect that the missing videotape had on the witnesses' ability to process his or her loss. He ensured that the witnesses' testimony did not go beyond those limitations in any meaningful way. While the testimony was prejudicial to the defense -- after all that is the general purpose of evidence in aggravation -- the evidence was not unfairly prejudicial. In its restricted form, the testimony was brief and rather straightforward. Although the record reflects that the witnesses were visibly emotional during their

testimony, they were not disruptively so.  In its limited form,

the admission of the testimony was not an abuse of discretion.

IV.

> WHETHER THE LOWER COURT ERRED IN SUMMARILY DISMISSING
> APPELLANT'S ARGUMENT THAT THE MILITARY JUDGE ABUSED
> HIS DISCRETION WHEN HE DENIED THE DEFENSE MOTION FOR A
> MISTRIAL BASED ON THE TRIAL COUNSEL'S COMMENTS
> REFERENCING (1) APPELLANT'S INVOCATION OF HIS RIGHT TO
> REMAIN SILENT TO ITALIAN AUTHORITIES; AND (2) HIS
> GENERAL RIGHT TO REMAIN SILENT WITH RESPECT TO NOT
> DISCLOSING INFORMATION ABOUT THE VIDEOTAPE.

During her opening statement, trial counsel told the

members that Ashby had admitted that he never told anyone about

the videotape even though he knew that there was going to be an

investigation into the incident.  She then stated that Ashby,

Schweitzer, and Capt. Seagraves met and discussed what they

should do with the videotape even after they knew that twenty

civilians had been killed and after they had appeared before an

Italian prosecutor.  She went on to tell the members:

> Even prior to that appearance before this Italian
> prosecutor, they were assigned Italian defense
> counsel.  You will hear testimony by these crew
> members that they were told that they had a right to
> remain silent, similar to American law, and that they
> invoked that right to remain silent.

Immediately following trial counsel's opening statement,

the defense requested a recess and the panel members were

excused.  Trial defense counsel moved for a mistrial based on

trial counsel's comment about Ashby's failure to disclose the

existence of the tape and his invocation of his right to remain

25

silent. After holding an R.C.M. 915(a) hearing on the motion outside the presence of the panel, the military judge denied the motion for a mistrial. He found that, while trial counsel's references to the fact that Ashby did not tell anyone about the videotape were based on evidence before the court, this was "not an area that counsel needed to be addressing." He also found that trial counsel's reference to Ashby's invocation of his right to remain silent was clear error. The military judge went on to conclude that these errors could be appropriately addressed through a curative instruction.

The military judge gave the parties an opportunity to re-voir dire the members and required trial counsel to redact her statements. He also gave the parties an opportunity to draft a proposed curative instruction. The defense declined the offer to re-voir dire the panel and suggested that additional language be added to the Government's proposed curative instruction. The military judge called the panel members back into the courtroom and instructed them:

> I want to just remind you that Captain Ashby has an
> absolute right to remain silent at all times. I want
> to remind you that you will not draw any inference
> adverse to Captain Ashby from any comment by the trial
> counsel in her opening statement that might suggest
> that Captain Ashby invoked his right to remain silent.
> You are directed to disregard any comment by trial
> counsel that may have alluded to any silence by
> Captain Ashby. You must not hold this against Captain
> Ashby for any reason, or speculate as to this matter.
> You are not permitted to consider that Captain Ashby

26

> may have exercised his absolute right to remain
> silent, at any time, as evidence for any purpose.
>
> As you know, we spent a great deal of time
> yesterday talking about the accused's right to remain
> silent. Accordingly, Captain Ashby was not required
> to speak to anyone about the video tape. Again, to
> the extent that the trial counsel may have implied
> that he was required to speak to anyone about the
> tape, that was incorrect.

The panel members were individually polled and each indicated that he would not let trial counsel's comments impact his deliberations. The military judge reiterated these instructions at the conclusion of the evidence.

Ashby argues that the military judge erred in finding that a curative instruction could alleviate the "egregious" harm arising from the improper comments that trial counsel made during her opening statement. He asserts that the comments suggested to the members that he had something to hide and argues that the error was compounded by other evidence that the Government introduced at trial suggesting that he exercised his right to remain silent.[8] The Government responds that the

---

[8] In support of this argument, Ashby cites to the testimony of the Italian magistrate that: (1) he initiated a criminal investigation in this case on February 3, 1998; (2) on February 4, 1998, he interrogated Ashby and the other crewmembers; and (3) on that day, Ashby signed a document acknowledging that he was the subject of an Italian criminal investigation. Ashby also cites to testimony that a friend of his -- Capt. M -- did not learn about the destruction of the videotape until Capt. Seagraves came out with the information. We find nothing in either the Italian magistrate's or Capt. M's testimony that can

military judge's curative instruction was an appropriate remedial measure and obviated the need for a mistrial.

R.C.M. 915(a) vests military judges with the discretion to declare a mistrial when "manifestly necessary in the interest of justice because of circumstances arising during the proceedings which cast substantial doubt upon the fairness of the proceedings."  However, the discussion to the rule advises caution, noting that mistrials are to be used "under urgent circumstances, and for plain and obvious reasons."  R.C.M. 915 Discussion; see United States v. Garces, 32 M.J. 345, 349 (C.M.A. 1991) (mistrial is a drastic remedy used to prevent miscarriage of justice).  Because of the extraordinary nature of a mistrial, military judges should explore the option of taking other remedial action, such as giving curative instructions. United States v. Fisiorek, 43 M.J. 244, 247 (C.A.A.F. 1995); United States v. Evans, 27 M.J. 34, 39 (C.M.A. 1988).  We will not reverse a military judge's determination on a mistrial absent clear evidence of an abuse of discretion.  United States v. Rushatz, 31 M.J. 450, 456 (C.M.A. 1990).

It is blackletter law that a trial counsel may not comment on the accused's exercise of his constitutionally protected rights, including his right to remain silent.  M.R.E. 301(f)(3);

---

be construed as an additional comment on Ashby's exercise of his right to remain silent.

United States v. Ashby, No. 08-0770/MC

United States v. Moran, 65 M.J. 178, 186 (C.A.A.F. 2007).

Therefore we concur with the military judge's assessment that

trial counsel's comments referencing Ashby's invocation of his

right to remain silent were improper.  Moran, 65 M.J. at 186-87.

We must now determine whether the error resulted in a

miscarriage of justice requiring a mistrial.  As this error was

of constitutional dimension, we also must determine whether the

error and the military judge's curative efforts rendered it

harmless beyond a reasonable doubt.  Chapman v. California, 386

U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can

be held harmless, the court must be able to declare a belief

that it was harmless beyond a reasonable doubt.").

In analyzing this question, we ask "'whether there is a

reasonable possibility that the evidence [or error] complained

of might have contributed to the conviction.'"  United States v.

Paige, 67 M.J. 442, 451 (C.A.A.F. 2009) (quoting Moran, 65 M.J.

at 187) (alteration in original).  The question is not whether

the members were "totally unaware" of the error; rather, the

essence of a harmless error is that it was "'unimportant in

relation to everything else the jury considered on the issue in

question.'"  Moran, 65 M.J. at 187 (quoting Yates v. Evatt, 500

U.S. 391, 403 (1991), overruled on other grounds by Estelle v.

McGuire, 502 U.S. 62, 72 n.4 (1991)).  We analyze trial

29

counsels' comments in the context of the entire court-martial. Id. at 186.

Upon consideration of the entire record, we hold that the error was harmless beyond a reasonable doubt.  The military judge took immediate corrective action which included giving the members a curative instruction, requiring trial counsel to redact her statements, and asking each member individually whether he could follow the military judge's instructions.  He also reminded the members at the close of the evidence about Ashby's absolute right to remain silent.  Absent evidence to the contrary, the members are presumed to follow the military judge's instructions.  United States v. Jenkins, 54 M.J. 12, 20 (C.A.A.F. 2000).  We conclude that the military judge's actions following the improper comment adequately cured the error and rendered it harmless beyond a reasonable doubt.  As such, a mistrial was not an appropriate remedy.  Rushatz, 31 M.J. at 456 ("Giving a curative instruction, rather than declaring a mistrial, is the preferred remedy for curing error when court members have heard inadmissible evidence, as long as the curative instruction avoids prejudice to the accused.") (citation omitted).

V.

WHETHER THE LOWER COURT ABUSED ITS DISCRETION IN NOT
FINDING THAT A SENTENCE WHICH INCLUDED SIX MONTHS OF

30

CONFINEMENT AND AN APPROVED DISMISSAL WAS INAPPROPRIATELY SEVERE.

## VI.

WHETHER THE LOWER COURT ERRED IN SUMMARILY DISMISSING APPELLANT'S ARGUMENT THAT THE DESTRUCTION OF THE VIDEOTAPE HAD NO EFFECT ON THE ADMINISTRATION OF JUSTICE BECAUSE IT CONTAINED NO MATERIAL EVIDENCE.

Having considered Issues V. and VI., we find no error and therefore affirm the Court of Criminal Appeals.

## VII.

WHETHER APPELLANT'S DUE PROCESS RIGHTS HAVE BEEN VIOLATED BY THE UNTIMELY POST-TRIAL PROCESSING AND APPELLATE REVIEW OF HIS COURT-MARTIAL.

Over ten years have elapsed since Ashby's trial. He was sentenced on May 10, 1999. The convening authority took action on January 3, 2000. The case was docketed at the Navy-Marine Corps court on March 13, 2000. On December 4, 2003, after filing thirty-three motions for an enlargement of time, appellate defense counsel filed a brief on Ashby's behalf. The Government answered on September 2, 2004, after filing six motions for an enlargement of time. The lower court issued its initial decision in this case on June 27, 2007, 2,970 days -- over eight years -- after Ashby was sentenced. The decision on further review after remand was issued on June 17, 2008.

Despite this significant period of delay, Ashby did not initially complain about delay before the Court of Criminal Appeals. In its June 27, 2007 opinion, that court, sua sponte,

31

raised and addressed the issue of post-trial delay. Ashby, 2007 CCA LEXIS 235, at *123, 2007 WL 1893626, at *42. The lower court found that, while the delay in this case denied Ashby his due process right to speedy review and appeal and was so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system, the due process violation was harmless beyond a reasonable doubt. Id. at *127-*129, 2007 WL 1893626, at *42-*43. The lower court reasoned that Ashby had never asserted his right to a speedy review and appeal and his assignments of error lacked merit. Id. at *128, 2007 WL 1893626, at *43. The court noted that, when it reviewed the case on remand, it would consider at that time whether it would be appropriate to grant discretionary relief for the delay under Article 66(c), UCMJ, 10 U.S.C. § 866 (2000). Id.

When the case was returned for further review, the lower court reconsidered the issue of harm arising from the delay and reaffirmed that the constitutional error in this case remained harmless beyond a reasonable doubt. Ashby, No. NMCCA 200000250, slip op. at 4. The lower court noted that Ashby's only allegation of specific prejudice -- an assertion that he would be prejudiced at any rehearing -- was rendered moot by the court's resolution of his assignments of error against him. Id. The court stated: "We further find that the length of the delay

32

in this case does not affect the findings and sentence that should be approved under Article 66(c), UCMJ." Id.

Before this court Ashby argues that the post-trial delay in his case violated his due process rights and was so extraordinary that the lower court should have granted him discretionary relief under its Article 66(c), UCMJ, authority. He also asserts that the lower court ignored the materials submitted with his second clemency request, which established that he suffered lost employment opportunities, was unable to travel, and suffered mental anguish as a result of the delay. The Government argues that the lower court was correct in ultimately denying Ashby relief and urges that providing relief for the delay in this case would provide Ashby with an undeserving windfall.

Article 66(c), UCMJ, vests in the Courts of Criminal Appeals broad authority to determine the findings and sentence that should be approved. Toohey v. United States, 60 M.J. 100, 103 (C.A.A.F. 2004). In conducting its sentence appropriateness review under Article 66(c), UCMJ, a Court of Criminal Appeals has "'broad discretion to grant or deny relief for unreasonable or unexplained [post-trial] delay . . . .'" United States v. Pflueger, 65 M.J. 127, 128 (C.A.A.F. 2007) (quoting United States v. Bodkins, 60 M.J. 322, 324 (C.A.A.F. 2004)) (alteration in original). "The power to review a case for sentence

33

appropriateness . . . is vested in the Courts of Criminal

Appeals, not in [this] Court, which is limited to errors of

law." United States v. Lacy, 50 M.J. 286, 288 (C.A.A.F. 1999).

Here, the Court of Criminal Appeals properly performed its

Article 66(c), UCMJ, sentence appropriateness review on the

record, and we will not disturb its conclusion that the delay

did not affect the findings and sentence that should be

approved.  Nor do we fault the Court of Criminal Appeals for

failing to address Ashby's employment prejudice argument, which

was based upon clemency materials submitted to the convening

authority but was not argued before that court.

We agree with the lower court that upon balancing the four

factors outlined in United States v. Moreno, 63 M.J. 129, 135

(C.A.A.F. 2006), the unreasonable post-trial delay in this case

violated Ashby's due process right to a speedy post-trial review

and appeal.[9]  The length of delay is facially unreasonable,

triggering the four-step inquiry and favoring Ashby in the

balancing analysis.  The second factor also favors Ashby as

there are no legally supportable explanations for the delay.

See Diaz v. Judge Advocate General of the Navy, 59 M.J. 34, 38-

---

[9] In assessing whether a facially unreasonable delay has resulted
in a due process violation, we weigh the following four factors,
as set forth in Barker v. Wingo, 407 U.S. 514, 530 (1972):  (1)
the length of the delay; (2) the reasons for the delay; (3) the
appellant's assertion of the right to timely review and appeal;
and (4) prejudice.  Moreno, 63 M.J. at 135.

40 (C.A.A.F. 2003); Moreno, 63 M.J. at 136-38.[10]  The third

factor favors the Government as Ashby did not assert his right

to a timely review until the Court of Criminal Appeals raised

the issue, sua sponte, in its initial decision.

As to the Barker prejudice factor, Ashby has not sustained

his burden of showing particularized prejudice.  After the case

was remanded, there remained no meritorious issues which may

have generated concern about Ashby's ability to present a

defense or favorable matters at a rehearing.  Ashby has not

suffered any oppressive incarceration.  There is no indication

that Ashby suffered unusual anxiety or hardship separate from

that normally experienced by an individual awaiting an appeal.

The fact that Ashby did not raise the issue of post-trial delay

until after the lower court identified the issue cuts against

his claim that he was harmed by the delay.  Ashby's belated

claim that he lost job opportunities as a result of his

---

[10] The Supreme Court recently held that the general rule, that a
delay caused by a defendant's counsel is charged to the
defendant, applies equally to privately retained or publically
assigned counsel.  Vermont v. Brillon, 129 S. Ct. 1283, 1292
(2009).  The Court noted, however, that this rule was not
absolute and that delay resulting from a systemic breakdown in
the public defender system could be charged to the state.  Id.
The impact of the Brillon decision on this court's jurisprudence
was not briefed nor argued in this appeal and it is therefore
not appropriate for the court to address at this time.

inability to travel due to his appellate leave status does not establish actionable harm arising from the delay.[11]

Despite the fact that Ashby has not established prejudice under the Barker analysis, in balancing and weighing the four factors, we agree with the lower court that the delay violated Ashby's due process rights to a speedy post-trial review and appeal.[12]

Having found a due process violation, we will grant relief unless we find that the Government has met its burden of showing that the constitutional error is harmless beyond a reasonable doubt. United States v. Bush, 68 M.J. 96, __ (15) (C.A.A.F. 2009). We review de novo the question of whether the error is harmless beyond a reasonable doubt. Id. at 15-16 (citing United

---

[11] Ashby did not claim prejudice arising from lost employment opportunities before the lower court. In his brief before this Court and during oral argument, Ashby called our attention to a letter from a potential employer, dated December 17, 2005, which he submitted with his clemency materials when the case was before the convening authority a second time. The letter does not specifically state that the company would have hired Ashby if he had a DD 214. It does, however, note that Ashby was unable to travel and would "find it difficult to obtain a government security clearance." Obtaining a DD 214 would alleviate Ashby's inability to travel but, as we have affirmed the Article 133, UCMJ, convictions, may or may not address the difficulty he may have in obtaining a security clearance. Under the circumstances of this case, this letter does not establish specific prejudice under United States v. Jones, 61 M.J. 80, 85 (C.A.A.F. 2005).
[12] See United States v. Toohey, 63 M.J. 353, 362 (C.A.A.F. 2006) (instructing on how to weigh the Barker factors when the delay period is such that it could adversely affect the public's perception of the fairness in the military justice system).

States v. Allison, 63 M.J. 365, 370 (C.A.A.F. 2006)).  We
consider the totality of the circumstances in assessing whether
the due process violation is harmless beyond a reasonable doubt.
Id. at 17.  We recently have noted that determining whether a
due process error was harmless beyond a reasonable doubt
necessarily involves analyzing the case for "prejudice," but
that analysis for "prejudice" is separate and distinct from the
consideration of prejudice as one of the four Barker factors.
Id. at 18.

Having carefully examined the entire record, we agree with
the lower court that, under the totality of the circumstances,
the post-trial delay was harmless beyond a reasonable doubt.
Finding no convincing evidence of prejudice in the record, we
will not presume prejudice from the length of the delay alone.
Toohey, 63 M.J. at 363.  As such, considering all the
circumstances of this case, we conclude that this error was
harmless beyond a reasonable doubt and no relief is warranted.

## VIII.

> WHETHER THE LOWER COURT ERRED IN FINDING (1) THAT
> APPELLANT'S CASE WAS NOT TAINTED BY ACTUAL OR APPARENT
> UNLAWFUL COMMAND INFLUENCE; AND (2) THAT LTGEN PACE
> WAS NOT DISQUALIFIED TO ACT AS CONVENING AUTHORITY BY
> VIRTUE OF BEING A TYPE 2 AND TYPE 3 ACCUSER.

The gondola incident was the focus of a great deal of
international and military attention.  Normally, aircraft

incidents such as this one would call for an Aircraft Mishap Board (AMB), but in this case, Lieutenant General (Lt. Gen.) Pace, who was serving as the Commander, United States Marine Corps Forces Atlantic, and Commander, United States Marine Corps Forces Europe, convened a Command Investigation Board (CIB) headed by his deputy, Major General (Maj. Gen.) DeLong. The CIB was an administrative factfinding body, not a prosecutorial or judicial entity. The CIB recommended that the mishap aircrew be the subject of disciplinary or administrative action. Lt. Gen. Pace ultimately referred the charges to a general court-martial.

This granted issue involves Ashby's complaints of unlawful command influence -- concerning actions of the CIB, as well as some external actions taken outside the investigation -- and his separate claim that Lt. Gen. Pace was disqualified from serving as the convening authority in this case because he was an "accuser" under R.C.M. 601(c). As to these claims, we adopt the following relevant facts, as found by the military judge.

On February 4, 1998, the day after the gondola accident, at Marine Corps Air Station, Cherry Point, North Carolina, Lieutenant Colonel (Lt. Col.) Watters, the Commanding Officer of the unit that had preceded Ashby's unit in the rotation at Aviano, advised all of the officers in his squadron to make any low-level flight videotapes from Aviano "disappear." Lt. Col.

Watters was relieved of his command on February 6, 1998, because of his speech to the officers.

After learning of Lt. Col. Watters's speech and the existence of video of a low-level flight several months earlier, Maj. Gen. Ryan, the commander of the 2d Marine Aircraft Wing at Cherry Point, addressed all of the aircrews from the Prowler communities at Cherry Point at an all-officers meeting (AOM). During the meeting, Maj. Gen. Ryan implied that the mishap aircrew caused the accident and were intentionally breaking rules by flying too low.  He was perceptibly upset during the meeting, and accused the Prowler community as a whole of violating rules on low-level flights ("flathatting"), and threatened them with punishment for violating flight rules. Maj. Gen. Ryan gave similar speeches over the next several days. He never specifically addressed any disciplinary proceedings against the mishap aircrew, what would be an appropriate punishment in the case, or whether fellow aviators should testify in the case.

Lt. Gen. Pace and Maj. Gen. DeLong had virtually daily telephonic contact throughout the duration of the CIB.  These conversations concerned proposed findings, conclusions, and recommendations of the CIB.  These conversations were monitored by Lt. Gen. Pace's SJA.  All of Lt. Gen. Pace's suggestions to Maj. Gen. DeLong were to clarify issues and, in one instance,

Lt. Gen. Pace suggested two areas for additional investigation. Maj. Gen. DeLong also received numerous phone calls from other senior officers seeking information about the progress of the CIB, including at least one call from the Commandant of the Marine Corps.

During the course of the CIB, there was intense international media coverage of the gondola incident and unsettled political relations between the United States and Italy. These issues were known by the CIB members. Also while the CIB investigation was ongoing, Brigadier General (Brig. Gen.) Bowden, the Assistant Wing Commander for the 2d Marine Aircraft Wing and Maj. Gen. Ryan's deputy, conducted an investigation of Prowler aircrews at Cherry Point to determine whether there were systemic problems with aircrews not following the flight rules for low-level flights. As part of this investigation, each aircrew member was read his or her Article 31, UCMJ, 10 U.S.C. § 831 (2000), rights for possible dereliction of duty.

Between February 21, 1998, and March 9, 1998, draft copies of the CIB's report were sent to Lt. Gen. Pace for his review and comments. On March 10, 1998, the final report of the CIB was submitted to Lt. Gen. Pace and others for their review and action. Each member of the CIB affirmed that his or her findings, opinions, and recommendations were not influenced by

any contacts with superior commands, with the exception of those issues raised by the testimony of one member.[13]

Lt. Gen. Pace began drafting an endorsement to the CIB's report. He composed it with the guidance of his legal counsel. The endorsement stated Lt. Gen. Pace's intent to convene an Article 32, UCMJ, 10 U.S.C. § 832 (2000), investigation "to consider whether charges such as involuntary manslaughter or negligent homicide, damage to private and government property, and dereliction of duty should be referred to a general court-martial" against the mishap aircrew. Lt. Gen. Pace's headquarters issued a news release announcing these recommendations and Lt. Gen. Pace's agreement with the CIB's principal conclusion that the cause of the accident was the fact that the aircrew flew lower than authorized.

On March 12, 1998, Maj. Gen. DeLong conducted a press conference at which he announced the CIB's findings. During that press conference, he incorrectly stated that the gondola cable system was marked on charts available to the aircrew. There is no indication that this mischaracterization was anything other than a mistake. He also stated that the cause of

---

[13] One of the CIB members, Colonel (Col.) B, testified that some members of the CIB had concerns about the frequency and number of proposed changes being offered to their draft reports. Maj. Gen. DeLong was apprised of the complaint and told the CIB members not to be concerned about what others outside the Board wanted them to say in their report.

the mishap was aircrew error.  After the press conference, Maj. Gen. DeLong met with the unit that had replaced Ashby's unit at Aviano.  At that meeting, he expressed his opinion that the aircrew was "flathatting."

The original charges were preferred against the four mishap aircrew members on March 24, 1998, by Gunnery Sergeant Ciarlo. The initial Article 32, UCMJ, session was held on April 20, 1998.  The next day, Capt. Howard Marroto, an aviator assigned to Ashby's unit, met with the Commandant in his Washington, D.C. office.  The Commandant expressed that the mishap crew would be disciplined if they did anything wrong and that "if someone is guilty, they need to be punished."  Capt. Marroto is a friend of both Ashby and Schweitzer, though not particularly close to either.  On May 20, 1998, Col. Triplett, the Commanding Officer of Marine Air Group 14, sent an e-mail to members of his command, cautioning them:  "You need to brief your people on this issue.  You don't want to be drug [sic] into this mess." He sent this e-mail in response to a message informing him how to handle inappropriate discovery requests by the defense counsel.

Lt. Gen. Pace referred the original charges against Ashby and Schweitzer on July 10, 1998.  The additional charges were preferred against Ashby and Schweitzer after they were arraigned on the original charges.  After Ashby's acquittal in his first

court-martial, the United States Ambassador to Italy stated that he was surprised at the verdict. In a press conference, President Clinton declined to comment on the acquittal, but Italian Prime Minister D'Alema expressed his disappointment in the verdict.

## Unlawful Command Influence

We first address Ashby's claim of unlawful command influence. Ashby argues that the record supports a finding that the CIB board was so interwoven with the prosecutorial process of the case that it was a "default preferral" and should not fall outside of the prohibition against unlawful command influence. He also argues that senior leadership exerted unlawful command influence over potential witnesses in this case by creating an overall "chilling environment," and in the following specific actions: (1) Maj. Gen. Ryan and Maj. Gen. DeLong's public speeches, amounting to "public condemnations of Appellant" to the pool of aviators from whom Appellant would select defense witnesses; (2) Brig. Gen. Bowden's investigation of other Prowler crews; (3) the Commandant's comments to Capt. Marotto; and (4) Col. Triplett's e-mail to his command advising his command to make sure they are not "drug [sic] into this mess." Ashby further contends that the established facts give the case the appearance of unlawful command influence.

43

The Government responds that Ashby has failed to identify any facts that, if true, would call into question the fairness of his court-martial. The Government urges us to reject Appellant's invitation to hold that administrative proceedings can be the basis of a claim of unlawful command influence. The Government notes that all of the events relating to the CIB occurred before the conduct underlying the two Article 133, UCMJ, charges came to light.

In Ashby's first court-martial, the military judge concluded that the concept of unlawful command influence did not apply to actions taken by individuals during the CIB, which was a purely administrative board, and, nonetheless, the CIB's decision did not result from outside influences. He further concluded that the defense had presented insufficient evidence of unlawful command influence to warrant shifting the burden of proof to the Government on the issue and, alternatively, he was convinced beyond a reasonable doubt that the charges against Ashby were free from actual or apparent unlawful command influence. In Ashby's second court-martial, the military judge re-affirmed his findings from the first court-martial regarding the unlawful command influence allegations.

The Court of Criminal Appeals adopted the military judge's findings of fact. Ashby, 2007 CCA LEXIS 235, at *88-*89, 2007 WL 1893626, at *29. The court generally agreed with the

military judge's position that, because the CIB was merely a factfinding entity and was not involved in the court-martial proceedings, the principle of unlawful command influence was not applicable to it.  Id. at *90-*91, 2007 WL 1893626, at *30. Nonetheless, the court was convinced beyond a reasonable doubt that there was no unlawful command influence at any stage of the proceedings, noting:  (1) the lack of evidence that Lt. Gen. Pace acted with the intent to influence the court-martial proceedings; and (2) the fact that Ashby had not shown that any of the other alleged statements or actions of leadership officials, made or taken in response to the gondola tragedy, had a specific direct or negative impact on the court-martial process.  Id. at *91-*94, 2007 WL 1893626, at *30-*31.  The lower court concluded that, nonetheless, no alleged unlawful command influence affected the instant court-martial, as:  (1) Ashby was acquitted of all of the original charges against him; and (2) he had not shown that this court-martial, which was separate and distinct from the original court-martial, was affected in any way by unlawful command influence.  Id. at *94-*97, 2007 WL 1893626, at *31.

Unlawful command influence has often been referred to as "the mortal enemy of military justice."  United States v. Gore, 60 M.J. 178, 178 (C.A.A.F. 2004) (citation and quotation marks omitted).  Article 37(a), UCMJ, 10 U.S.C. § 837(a) (2000),

45

provides, in relevant part:  "No person subject to this chapter may attempt to coerce or . . . influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case . . . ."  Even the mere appearance of unlawful command influence may be "as devastating to the military justice system as the actual manipulation of any given trial."  United States v. Ayers, 54 M.J. 85, 94-95 (C.A.A.F. 2000) (citation and quotation marks omitted).  This Court has "repeatedly condemned unlawful command influence directed against prospective witnesses."  Gore, 60 M.J. at 185.

An accused has the initial burden of raising the issue of unlawful command influence.  United States v. Stombaugh, 40 M.J. 208, 213 (C.M.A. 1994).  This burden at trial is to show facts which, if true, constitute unlawful command influence, and that the alleged unlawful command influence has a logical connection to the court-martial, in terms of its potential to cause unfairness in the proceedings.  United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F. 1999).  On appeal, the defense must "'(1) show facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the cause of the unfairness.'"  United States v. Simpson, 58 M.J. 368, 374 (C.A.A.F. 2003) (quoting Biagase, 50 M.J. at 150).

We conclude that Ashby has failed to show facts which, if true, constituted unlawful command influence. His claims regarding the CIB are predicated on communications between the members of the CIB and various senior military officers. However, he has failed to show facts which, if true, would demonstrate that the CIB members were wrongfully influenced. Ashby is asking us to speculate on pressure placed on members of the CIB as a result of the attention that the military gave to this case. Mere speculation that unlawful command influence occurred because of a specific set of circumstances is not sufficient. Ashby has failed to show that the senior military officials' interest in the CIB was anything other than proper, official, and lawfully directed at completing a quality and thorough investigation.[14]

With regard to Ashby's claim of unlawful command influence arising from the other actions by senior military officials, including the Commandant, Ashby has not pointed to any specific witnesses who decided not to testify because of the alleged statements by senior military officials or any other specific facts that the court-martial process was tainted by unlawful command influence. Because of the highly publicized

---

[14] We decline to adopt a blanket rule that unlawful command influence can never exist in the context of an administrative proceeding, but find that in this case it did not.

47

international nature of the incident, it is understandable that many senior military officials became publicly involved in the aftermath and investigation of the accident. However, there is no direct evidence that the actions of any of those officials improperly influenced Ashby's court-martial.

We also hold that the facts in this case did not create the appearance of unlawful command influence. In addressing whether the appearance of unlawful command influence has been created in a particular situation, we consider, objectively, "the perception of fairness in the military justice system as viewed through the eyes of a reasonable member of the public." United States v. Lewis, 63 M.J. 405, 415 (C.A.A.F. 2006). We will find the appearance of unlawful command influence where "an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." Id. Under these circumstances, the comments made by senior military officials in the aftermath of the gondola accident and their official involvement in the investigation of the incident could not reasonably be perceived by a disinterested member of the public as improper command influence or otherwise indicative of an unfair proceeding.

As a final matter, we note that Ashby was acquitted on all of the charges that were filed after the CIB issued its

recommendation, and the CIB was neither aware of nor considered the conduct underlying the Article 133, UCMJ, charges. It is therefore not surprising that Ashby is unable to allege facts which, if true, would constitute unlawful command influence when the CIB members were unaware of the conduct underlying the current charges.

Accuser Issue

The question of whether a convening authority is an "accuser" under Article 1(9), UCMJ, 10 U.S.C. § 801(9) (2000), is a question of law that we review de novo. See United States v. Conn, 6 M.J. 351, 354 (C.M.A. 1979). Under Article 1(9), UCMJ, an accuser is an individual: (1) "who signs and swears to charges"; (2) "who directs that charges nominally be signed and sworn to by another [type two accuser]"; or (3) "who has an interest other than an official interest in the prosecution of the accused [type three accuser]." An accuser may not convene a general or special court-martial, nor may he refer charges to a court-martial. R.C.M. 504(c)(1); R.C.M. 601(c). Convening authorities are not disqualified from referring charges by prior participation in the same case except when they have acted as accuser." R.C.M. 601(c) Discussion.

Ashby argues that the convening authority, Lt. Gen. Pace, should have been disqualified from serving as the convening authority in this case because he was an "accuser" within the

definition in Article 1(9), UCMJ.  Ashby contends that Lt. Gen. Pace was a "type two" accuser because he essentially engineered the preferral process through influencing the CIB and identifying the charges in his endorsement of the CIB report -- the same charges that ultimately were preferred.  Ashby asserts that forwarding the CIB report was the functional equivalent of directing specific charges to be preferred.  He also argues that Lt. Gen. Pace was a "type three" accuser by virtue of his deep personal involvement in the CIB proceedings and predisposition towards Ashby's guilt.  The Government responds that Lt. Gen. Pace was not disqualified from acting as convening authority, as there was no evidence that he was acting improperly or in anything but his official capacity in taking actions regarding the mishap incident.

In Ashby's first court-martial, the military judge found that Lt. Gen. Pace did not "direct" the preferral of any particular charges against Appellant even though he forwarded the CIB report for the drafting of charges and mentioned some specific charges.  The military judge noted that the similarity between the charges mentioned in the endorsement to the CIB and the charges that appeared on the charge sheet was a result of a legal review of the CIB.  He also found that Lt. Gen. Pace's interest in the disposition of the allegations and preferred charges was an official interest only.  In Ashby's second court-

martial, the military judge ruled that Lt. Gen. Pace had no interest in the current charges other than an official one.

Addressing this issue on appeal, the lower court concluded that Lt. Gen. Pace was neither a "type two" nor a "type three" accuser regarding the original charges preferred against Ashby, since: (1) there was no credible evidence that Lt. Gen. Pace "directed" that charges specifically be preferred; and (2) the evidence established that Lt. Gen. Pace's interest in the disposition of the allegations and preferral of charges against Ashby was only an "official" one and that he did not abandon his neutral role and become an "accuser." Ashby, 2007 CCA LEXIS 235, at *65-*66, *70-*74, 2007 WL 1893626, at *21-*23.

The test for determining whether a convening authority is an accuser is "'whether he was so closely connected to the offense that a reasonable person would conclude that he had a personal interest in the matter.'" United States v. Voorhees, 50 M.J. 494, 499 (C.A.A.F. 1999) (quoting United States v. Jackson, 3 M.J. 153, 154 (C.M.A. 1977)). "Personal interests relate to matters affecting the convening authority's ego, family, and personal property" and "[a] convening authority's dramatic expression of anger towards an accused might also disqualify the commander if it demonstrates personal animosity." Id. We have found a personal interest where, for example, the convening authority is the victim in the case, United States v.

Gordon, 1 C.M.A. 255, 2 C.M.R. 161 (1952); where the accused attempted to blackmail the convening authority, United States v. Jeter, 35 M.J. 442 (C.M.A. 1992); and where the accused had potentially inappropriate personal contacts with the convening authority's fiancée, United States v. Nix, 40 M.J. 6 (C.M.A. 1994).

We have carefully reviewed Ashby's assertions, the record materials, and the findings of fact. We agree with the Court of Criminal Appeals that Lt. Gen. Pace took no actions equivalent to directing that charges nominally be signed and sworn to by another. Lt. Gen. Pace's action in forwarding the CIB to the servicing legal office for consideration of appropriate charges was consistent with the performance of his duties as a commander. We presume that the legal officers properly performed their professional duties which included independent review of the evidence and preparation of only those charges for which they determined probable cause existed. See Article 34, UCMJ, 10 U.S.C. § 834 (2000) (imposing a duty on the staff judge advocate to prepare advice to the convening authority before a charge is referred to a general court-martial); United States v. Masusock, 1 C.M.A. 32, 35, 1 C.M.R. 32, 35 (1951) (citing the presumption that a public officer charged with a particular duty has performed it properly); United States v. Roland, 31 M.J. 747, 750 (A.C.M.R. 1990) ("We will presume, in the absence of

52

evidence to the contrary, that the staff judge advocate properly discharged his duties."). In this light, Lt. Gen. Pace did nothing to make him a nominal accuser. In addition, any claim that he was a "type two" accuser is diminished in the case of these particular charges, as they were not investigated by the CIB, were not encompassed in Lt. Gen. Pace's forwarding endorsement to the CIB, and were independently preferred. Ashby has failed to show any acts by Lt. Gen. Pace that would make him a "type two" accuser.

Concerning Ashby's claim that Lt. Gen. Pace was a "type three" accuser, this record contains no evidence of personal interest or bias on the part of Lt. Gen. Pace such that he was transformed into a de facto accuser. Although Lt. Gen. Pace was involved in the preliminary investigation of the case, his interest appears to have been wholly official. Interest in an incident and the investigation thereof is not personal -- it is in fact the responsibility of a commander. Similarly, the frequency of Lt. Gen. Pace's contact with the CIB or the number of times that he reviewed the draft CIB report do not reflect a personal rather than a professional interest. Again, we note that these charges stem from outside the CIB. Ashby has failed to show that he is entitled to relief as to this issue.

IX.

> WHETHER THE LOWER COURT ERRED IN FINDING THAT THE
> CONVENING AUTHORITY DID NOT ABUSE HIS DISCRETION IN
> FAILING TO WITHDRAW THE ARTICLE 133, UCMJ, CHARGE FROM
> REFERRAL TO A GENERAL COURT-MARTIAL ONCE APPELLANT WAS
> ACQUITTED OF THE ORIGINAL CHANGES.

In his final assignment of error, Ashby argues that, given Lt. Gen. Pace's personal involvement in the disposition of the case, the media pressure surrounding it, and his acquittal on the original charges, Lt. Gen. Pace's referral of the Article 133, UCMJ, charges to a general court-martial was in bad faith and constituted an abuse of discretion. The Government responds that, considering that Ashby was a commissioned officer and that the charges required significant investigations, the convening authority's decision to refer the case to a general court-marital was not improper.

R.C.M. 306(b) provides that "[a]llegations of offenses should be disposed of . . . at the lowest appropriate level of disposition . . . ." However, under R.C.M. 306 and R.C.M. 407, a convening authority exercising general court-martial jurisdiction has wide discretion to choose among a variety of options in disposing of a charge, including referring the charges to a general court-martial. See R.C.M. 407; United States v. Dinges, 55 M.J. 308, 314 (C.A.A.F. 2001) (discussing the "virtually unfettered authority" of a commander exercising special court-martial jurisdiction).

We hold that the convening authority's decision to refer the Article 133, UCMJ, charge to a general court-martial, rather than a lesser forum, was not an abuse of his discretion. As we noted earlier, the matter of the destruction of the videotape was discovered after the original charges had been referred, and a separate charge alleging violations of Article 133, UCMJ, was preferred. Lt. Gen. Pace directed that the Article 133, UCMJ, charge be tried in conjunction with the original charge. However, at his initial trial, Ashby refused to consent to the joinder of the Article 133, UCMJ, charge, and Lt. Gen. Pace withdrew it. Ashby was therefore aware that the Article 133, UCMJ, specifications could later be separately referred -- and they were.

Since the two Article 133, UCMJ, specifications were initially referred before Ashby was acquitted on the original charges, it is difficult to say that the re-referral of the Article 133, UCMJ, charge was in any way retaliatory. Ashby's allegation of bad faith is unfounded. We conclude that Lt. Gen. Pace acted within his discretion in referring the Article 133, UCMJ, charges to a general court-martial, where Ashby was a commissioned officer and the charges involved obstruction of justice in an exhaustive investigation into the deaths of twenty people and extensive damage to military property.

DECISION

We affirm the decision of the United States Navy-Marine Corps Court of Criminal Appeals.

United States v. Ashby, No. 08-0770/MC

STUCKY, Judge (concurring):

I concur in the Court's judgment, and in virtually all of Judge Erdmann's exhaustive opinion. I write separately only to note my understanding of the discussion of Issue I, and to state a reservation with respect to Issue VII.

With respect to Issue I, as the lead opinion notes, the Government elected to incorporate the existing offenses of obstruction of justice (Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (1994)) and conspiracy to obstruct justice (Article 81, UCMJ, 10 U.S.C. § 881 (1994)) into the Article 133, UCMJ, 10 U.S.C. § 933 (1994), charge of conduct unbecoming an officer and a gentleman. The military judge instructed the members on the elements of those underlying offenses, and the Court of Criminal Appeals analyzed the issue of legal sufficiency in those terms. I do not understand the lead opinion as holding that the military judge was required to do as he did, but simply as applying the law of this case as we found it. I wholly concur with the legal sufficiency analysis of the lead opinion as it relates to the elements of the underlying offenses.

With respect to Issue VII, consistent with the position I took in United States v. Bush, I question the application of the "public perception" standard of United States v. Toohey, 63 M.J. 353 (C.A.A.F. 2006) (Toohey II). See Bush, 68 M.J. 96, __ (1-8)

(C.A.A.F. 2009) (Ryan, J., with whom Stucky, J., joined, concurring in the judgment).  However, I completely agree with the lead opinion's holding that Appellant has not made the requisite showing of prejudice under Barker v. Wingo, 407 U.S. 514, 530 (1972).  I therefore concur.