UNITED STATES, Appellee,

v.

Private First Class Arthur A. JENKINS III, United States Army, Appellant.

ARMY 9502038.

U.S. Army Court of Criminal Appeals.

March 30, 1998.

For Appellant: Robert D. Levenstein (argued); Captain Dirk Gifford, JA (on brief).

For Appellee: Captain Thomas N. Auble, JA (argued); Colonel Joseph E. Ross, JA; Lieutenant Colonel Frederic L. Borch III, JA; Captain Chris A. Wendelbo, JA (on brief).

Before TOOMEY, Senior Judge, TRANT and CARTER, Appellate Military Judges.

## OPINION OF THE COURT

TRANT, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of two specifications of assault consummated by a battery, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C. § 928 (1988) [hereinafter UCMJ]. Contrary to his pleas, appellant was found guilty of false official statement, rape, forcible anal sodomy, aggravated assault, wrongful communication of a threat (two specifications), and obstruction of justice (two specifications), in violation of Articles 107, 120, 125, 128, and 134, UCMJ, 10 U.S.C. §§ 907, 920, 925, 928, and 934. The approved sentence included a dishonorable discharge, confinement for twenty-eight years, forfeiture of all pay and allowances, and reduction to the grade of Private E1.

Appellant asserts: (1) uncharged misconduct evidence of previous bad acts was improperly admitted, (2) one of the obstruction of justice offenses is factually insufficient, (3) the evidence is factually insufficient to sustain the rape and sodomy convictions, and (4) the sentence is inappropriate. Only the first two assertions warrant discussion.

### Facts

Exercising our fact-finding authority under Article 66(c), UCMJ, we find the following facts. Appellant has a long and sordid history of battering his spouse, S.J. On 22 February 1995, S.J. called appellant on the telephone at a barracks room of a friend of appellant's to remind him that she was waiting for him to drive her to a family support group meeting. The fact that his spouse called him at the barracks while he was having a few drinks with his friend embarrassed and angered appellant, and a verbal argument ensued over the telephone. When appellant arrived home, the argument continued and S.J. did not attend the meeting. S.J. telephoned a friend and co-worker, Carol, and asked her to come to the house (ostensibly to deliver her paycheck, but in reality to assist S.J. to leave with the three children). Appellant, who intended to go out with some friends, ordered S.J. to lay out his clothes, get his shoes ready and fix him something to eat. S.J. and appellant were in their bedroom when Carol arrived and knocked on the door. Appellant verbally intimidated S.J. with the ominous challenge,

"You got two choices, you can either run to the door and run out and call the police and tell them what happened or you can stay right here." S.J. decided that she could not make it out the door with the children and so, let the knock go unanswered.

Appellant finished eating and told S.J. to take off her clothes because he wanted to have sex before he went out. When S.J. refused to comply, appellant said, "What you mean you don't want to fuck me? Bitch, you're bought and paid for." S.J. backed up toward the closet. Appellant grabbed her arm, twisted it around behind her back and said, "I should break this one like I broke the other one." In the ensuing struggle, appellant threw a can of shoe polish that hit S.J. in the leg. The couple's three children, who were in an adjoining bedroom, heard the argument. The 10 year-old daughter, A.J., came to the door of her parents' bedroom while appellant was trying to subdue and strip S.J. Appellant ordered A.J., who was crying, back to her room. Appellant picked her up and told her that he "brought her into this world and he could take her out of it." After A.J. left, appellant completed the forcible undressing of S.J. and ordered her to get on the bed. S.J. refused. Appellant grabbed her, pushed her onto her back on the bed, pulled her head back by the hair and started having sexual intercourse with her. S.J. repeatedly and unequivocally told appellant that she did not want to have sex with him. Appellant told S.J. that he did not want to look at her face and ordered her to roll over. She refused. Appellant forced her onto her stomach and, against her will, anally sodomized her.

After appellant left the apartment, S.J. quickly dressed the children and fled the apartment with them. S.J. stayed with friends that night and reported the incident to appellant's company commander the next morning.

Colorado Springs Police Officer Kelley, investigating S.J.'s complaint, interviewed appellant at the civilian police station. Officer Kelley advised appellant of his *Miranda*[1] rights and informed him that he was suspected of first degree sexual assault[2] and third degree sexual assault.[3] Appellant waived his *Miranda* rights and agreed to talk with Officer Kelley. Appellant's demeanor was "laid back" and he seemed "more interested in what his bond was going to be and how fast he could get out of jail."

Appellant made an unsworn, verbal statement to Officer Kelley. Appellant stated that he had been drinking beer with a friend at the barracks when S.J. called on the telephone to remind him of the family support group meeting. When appellant arrived home, S.J. was agitated about his forgetting the meeting and began to argue with him. After getting into the car, they decided not to go to the meeting, and instead went to the store to get some boxes for their daughter's school project, and returned home. S.J. was still angry with him. Appellant told S.J. that he was going out with friends that night and she angrily accused him of seeing another woman. Appellant ate his dinner, took a two-to-three-hour nap, and had consensual sex[4] with S.J. when he woke up. At approximately 2300 hours, after receiving a telephone call from a friend asking appellant to meet him at a sports bar, appellant again had consensual sex with S.J., got out of bed immediately thereafter, and got ready to go meet his friend. S.J. was angry that appellant would not cuddle with her after having sex. Appellant stated there was no disturbance that evening, he had never broken any of her bones, never touched her, and never

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. COLO.REV.STAT. § 18–3–402, 8B C.R.S. (1986) (sexual assaults involving penetration by means of actual force, violence, threats of death, serious bodily harm or kidnapping, or drugged incapacitation).

3. COLO.REV.STAT. § 18–3–404, 8B C.R.S. (1986) (non-consensual sexual contact not involving penetration).

4. When Officer Kelley asked appellant if the sex was "common sex" (i.e., sexual intercourse) or the type of sex that S.J. was alleging (i.e., anal sodomy), appellant "smiled, seemed a little embarrassed and said, 'That's personal' " and declined to specify.

physically abused her.[5]

A few days later, appellant telephoned S.J. and attempted to intimidate her into dropping the charges by threatening to have custody of A.J. taken away by appellant's mother.[6] S.J. refused appellant's entreaties and moved with her three children to Louisiana. Approximately a month later, S.J. talked to appellant on the telephone and told him that she wanted a divorce. Appellant stated that he would never give her a divorce, that he would "drag her back to Colorado, if he had to" and said, "Bitch, you're as good as dead."

## Discussion

### I. Evidence of Previous Bad Acts

In a pretrial motion in limine,[7] the government sought a ruling on the admissibility of previous acts of violence by appellant against S.J. under Military Rule of Evidence 404(b) [hereinafter Mil.R.Evid.].[8] These bad acts included:

1. In 1985, S.J., who was eight months pregnant with A.J., went to a fraternity house where appellant, then (her boyfriend), was at a party. Appellant was embarrassed that S.J. had come looking for him and proceeded to push her out the door and over the porch railing. As S.J. was assisted to her car, appellant pulled a pistol out of his car and fired shots in her direction. (Appellant was apprehended for aggravated assault).

2. In 1987, appellant confronted S.J. about her plans to marry someone else. Appellant stated, "If I can't have you, then no one will" and slapped S.J. on the face. (Appellant pleaded nolo contendre in civilian court).

3. In 1991, appellant and S.J. were arguing in her living room, again about her intention to marry someone else. S.J. attempted to leave and appellant intentionally slammed the door on her hand, breaking a bone in her hand.

4. In 1992, appellant and S.J. were arguing in a bar over another man's offer to buy S.J. a drink. Appellant pushed her, causing her to spill the drink on herself. Outside the bar, appellant struck her again and, when S.J. attempted to get into a friend's car, appellant dragged her out. S.J. attempted to flee, but appellant caught her and struck her in the head with a pipe or pole. S.J. needed 8–12 stitches to close the wound.

5. In 1993, appellant and S.J. argued over her refusal to iron his clothes so he could go out. S.J. fled the house, but appellant chased after her and struck her in the back. In her effort to defend herself, S.J. held up her arm and appellant injured her wrist.

To be admissible under Mil.R.Evid. 404(b), this evidence of misconduct must be offered for a valid purpose and not to demonstrate appellant's criminal propensities. *United States v. Miller,* 46 M.J. 63, 65 (1997); *United States v. Castillo,* 29 M.J. 145, 150 (C.M.A.1989). The prosecution offered the above evidence to show appellant's plan, motive and intent to exercise control over his spouse through violence.[9] *United States v.*

---

**5.** Although Specification 4, Charge VI, alleges, inter alia, that appellant told Officer Kelley that S.J. "had broken her hand by hitting another woman during a fight" and that statement appears in Officer Kelley's report (P.E. 22 for identification), that evidence was not introduced at trial.

**6.** At the time of his enlistment, appellant and S.J. had three children. In order to overcome an enlistment disqualification for having more than two children, appellant convinced S.J. to sign legal custody of A.J. over to his mother.

**7.** Rule for Courts–Martial 906(b)(13).

**8.** Mil.R.Evid. 404(b), *Other crimes, wrongs, or acts,* provides, in part:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

**9.** It is not necessary "that relevant evidence fit snugly into a pigeon hole provided by Mil.R.Evid. 404(b)." *Castillo,* 29 M.J. at 150. Nevertheless, the profferer should delineate the theories of admissibility, as occurred here, and not simply render a talismanic incantation of all the bases listed in the rule, as often occurs.

*Reynolds,* 29 M.J. 105, 109 (C.M.A.1989), established a three-part test for the admissibility of such evidence, as follows: First, the evidence must reasonably tend to prove that the accused committed the uncharged crimes, wrongs, or acts; second, the evidence must make some fact that is of consequence more or less probable; and, third, the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice.

The military judge applied this three-part test and made the following findings of fact and conclusions of law:

> The testimony of Ms. Jenkins as to these incidents, as proffered by the trial counsel, could reasonably support a finding by the finder of fact that [appellant] committed prior uncharged acts.
>
> The evidence of prior uncharged misconduct is not being offered for the purpose of proving [appellant's] criminal propensity. The evidence is relevant to the charged offenses for its tendency, if any, to prove [appellant's] prior course of conduct toward Ms. Jenkins—prior and continuing course of conduct toward Ms. Jenkins, his motive for committing the offenses charged, his desire and intent to maintain control over Ms. Jenkins, regardless of the degree of force necessary to do so and plan to commit the offenses.
>
> The incidents, although occurring over a long period of time, are highly probative given the repetition of very similar circumstances on five occasions, always between [appellant] and Ms. Jenkins, always involving matters beyond the control of [appellant], matters which led to an argument and a lashing out, and often times to injury to Ms. Jenkins. Also probative is [appellant's] statement, "If I can't have you, nobody can."
>
> Applying a [Mil.R.Evid.] 403 balancing test, I find that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice to [appellant].
>
> I will allow the government to offer this evidence for the specific purpose of its tendency, if any, to show prior course of conduct by [appellant] toward Ms. Jenkins,

a motive for committing the offenses, plan and the intent to exercise control over his wife, regardless of the consequences.

■ The military judge's ruling on the admissibility of this evidence will not be disturbed absent an abuse of discretion and this may be found only when the military judge's decision is "arbitrary, fanciful, clearly unreasonable or clearly erroneous." *Miller,* 46 M.J. at 65.

## II. Bases of Admissibility

Motive, intent, and plan are distinct concepts that are often blurred because they all concern the mental aspects of the crime.

### A. Motive

Motive is the moving force that induces the criminal act and comes into play before the actus reus, that is, why the criminal did the act. *See* E. IMWINKELREID, UNCHARGED MISCONDUCT EVIDENCE, §§ 3:15–3:18 (1984). Evidence of motive may be used to identify the accused as the perpetrator of the charged criminal act in two ways. First, if there is a causal connection, the act of uncharged misconduct may supply the motive for the charged act. For example, evidence of an uncharged drug deal may provide the motive for the charged murder of an eyewitness to the drug deal. *See Williams v. Armontrout,* 891 F.2d 656, 663 (8th Cir.1989). Second, if there is a common motive for both the uncharged misconduct and the charged offense, evidence that the accused committed the former strengthens the inference of his having committed the latter. For example, uncharged assaults against a victim that evince hatred (motive) may help prove the identity of the perpetrator of a charged murder against the same victim. *See Hill v. United States,* 600 A.2d 58 (D.C.1991).

In *United States v. Watkins,* 21 M.J. 224, 227 (C.M.A.1986), the court held that evidence of motive is relevant "to show the doing of an act by a person as an outlet for [an] emotion." Such evidence is admissible provided "the prior acts of conduct [are] the type which reasonably could be viewed as 'the expression and effect of the existing internal emotion'" and "the same motive [is] shown to have existed in appellant at the

time of the subsequently charged acts." *Watkins*, 21 M.J. at 227 (citations omitted). The court found that seven acts of violence by Watkins against five different women while he was intoxicated were admissible because "[s]uch conduct, repeated on numerous occasions, reasonably reflects hostile feelings on the part of appellant towards women." *Watkins*, 21 M.J. at 227 (citations omitted). Such evidence was relevant even though, as in the instant case, the uncharged acts were for assaults and batteries while the charged acts included rape and forcible sodomy.

Indeed, in appellant's case, the fact that the uncharged and charged acts had a common victim (his spouse) strengthens the motive relevancy. In *Thiede v. Utah*, 159 U.S. 510, 16 S.Ct. 62, 40 L.Ed. 237 (1895), the Supreme Court upheld the admissibility of evidence of ill treatment by a husband of his spouse [10] when the husband was charged with the murder of his spouse. The Court noted that the evidence

> was introduced for the purpose of showing ill treatment by defendant of deceased, and a state of bitter feeling between them. This, of course, bears on the question of motive, and tends to rebut the presumed improbability of a husband murdering his wife.... Whether the relations between the defendant and his wife were friendly or the reverse, was to be settled, not by direct or positive but by circumstantial evidence, and any circumstance which tended to throw light thereon might fairly be admitted in evidence before the jury.

*Thiede*, 159 U.S. at 517–18, 16 S.Ct. at 65. *See also United States v. Fierro*, 39 M.J. 1046, 1048–49 (A.C.M.R.1994). In the instant case, the charged and uncharged acts of domestic violence by appellant against the same victim, S.J., evince a common motive, i.e., hostility. *See Garibay v. United States*, 634 A.2d 946 (D.C.1993)(in domestic violence cases, evidence of previous hostility between spouses or lovers may be of particular relevance to show motive).

## B. Intent

Intent is an integral part of the mens rea element of the criminal act and accompanies the actus reus, that is, what the criminal meant to accomplish by the act. *See* IMWINKELREID, *supra*, § 5:02. Uncharged misconduct can be probative of general criminal intent, such as that required of rape and forcible sodomy. *See United States v. Hebert*, 35 M.J. 266, 268–69 (C.M.A.1992). "[T]he recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act." 2 WIGMORE, EVIDENCE § 302, at 241 (Chadbourn rev.1979) (parentheticals in original); *see also, United States v. Naranjo*, 710 F.2d 1465 (10th Cir.1983). In the instant case, the military judge found that appellant had assaulted to dominate or control his spouse when she deigned to act independent of him or defied him. If the uncharged acts (assaults) were committed with the same intent (to dominate and control his spouse) relevant to the charged offenses (rape and forcible sodomy), then, if the appellant committed the charged acts (sexual intercourse and sodomy), it may be inferred that he did so with a similar intent.

> [T]he relevancy of the [uncharged] offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the [uncharged] and charged offenses. The reasoning is that because the defendant had unlawful intent in the [uncharged] offense, it is less likely that he had lawful intent in the present offense.

*United States v. Beechum*, 582 F.2d 898, 911 (5th Cir.1978)(en banc).

■ There is no requirement that the uncharged acts be identical to the charged act so long as there is sufficient similarity to logically conclude that a similar intent exist-

---

**10.** "The witnesses testified to hearing the deceased scream at several times; to seeing her with black eyes and a bruised face; to her eyes looking red; to her crying on several occasions, and appearing alarmed and scared, and to bruises and discolorations of her body." *Thiede*, 159 U.S. at 518, 16 S.Ct. at 65.

ed. *See United States v. Bender,* 33 M.J. 111 (C.M.A.1991). In the instant case, the uncharged acts of violence against his spouse were sufficiently similar to the charged acts of violence against his spouse to support an inference that a similar intent existed. *See Watkins,* 21 M.J. at 227; *United States v. Brannan,* 18 M.J. 181, 184–85 (C.M.A.1984).

### C. Plan

■ Plan is a commonality of purpose that links otherwise disparate criminal acts as stages in the execution of a singular scheme. *See* IMWINKELREID, *supra,* § 3:20. Uncharged and charged acts are part of a common or continuing plan when they are mutually dependant or interlocking steps toward the accomplishment of the same final goal. *See Ali v. United States,* 520 A.2d 306, 311–12 (D.C.1987). It is the interconnectivity of the acts inspired by a singular purpose, similar to common motive, that manifests a plan. In *United States v. Rath,* 27 M.J. 600 (A.C.M.R.1988), the accused was charged with sodomy of D.R., his daughter, and the government introduced evidence of the accused's uncharged acts of sexual abuse against D.R. as "proof of [accused's] prior course of conduct towards D.R., a course of conduct encompassing almost a decade during which time D.R. was an object of the [accused's] sexual affections." This court upheld the admissibility of that evidence as it "established a continuing scheme of victimization of D.R. by the [accused]." *Rath,* 27 M.J. at 609; *see United States v. Ortiz,* 33 M.J. 549 (A.C.M.R.1991).

■ A succession of similar acts standing alone does not, however, establish the existence of a plan. For example, a series of similar robberies may only evince separate decisions to rob (inadmissible propensity evidence) and not be sequential links in a plan leading to an ultimate goal. *See Ali,* 520 A.2d at 311–12. Nevertheless, unlike the "unique methodology" requirement of the modus operandi theory, there is no requirement for the separate acts to be similar when offered to establish a common plan. For example, an uncharged larceny of an automo-

bile, that is subsequently used as a getaway vehicle in a charged kidnapping or robbery, may be separate acts in the same drama and thus probative of a larger plan. *See* IMWINKELREID, *supra,* § 3:21.

Appellant's plan was to dominate and subjugate his spouse by fear, humiliation, and verbal or physical assaults. Appellant sought to control, intimidate, and terrorize S.J. and would not countenance independence or perceived disobedience by her. The tools of his trade, that of a cowardly batterer, were physical, emotional, psychological, and sexual abuse. Each of the uncharged and charged acts of violence were components of the recurring pattern of domestic violence that evinced the overall plan. Appellant's contention that the uncharged acts were not part of an overall plan with the charged acts because the former were acts of physical violence while the latter were acts of sexual violence is specious. Sexual assaults are not uncommon in spouse battering.

■ The government had three solid bases of admissibility, i.e., motive, intent, and plan, for uncharged acts of misconduct. The military judge correctly applied the three-part test required by *Reynolds,* 29 M.J. at 109, and clearly did not abuse his discretion in admitting them jointly or severally. Accordingly, we find this assignment of error to be without merit.

### III. Obstruction of Justice

Appellant was convicted of obstruction of justice based upon his verbal, unsworn statements to a civilian police officer during an investigation in which he was the suspect. The elements of this offense, as charged, are:

(1) Appellant wrongfully did certain acts, that is, he falsely told a civilian police officer during a criminal investigation that he had consensual sex with his spouse, there was no disturbance, he had never broken any of her bones, never harmed her, never physically touched her, and she had broken her hand by hitting another woman during a fight;[11]

11. On this last averment, there is no evidence that appellant told Officer Kelley that his wife

broke her hand in a fight with another woman. We will rectify this in our decretal paragraph.

(2) Appellant did so in the case of himself against whom he had reason to believe there were or would be criminal proceedings pending;

(3) The acts were done with the intent to impede the due administration of justice; and

(4) Under the circumstances, the conduct of appellant was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.[12]

Appellant asserts that his protestations of innocence during an interrogation were "intended only to forestall or preclude discovery of his offense" and not with the intent to impede the due administration of justice. We disagree.

■■■ The gravamen of the military offense of obstruction of justice is "the corruption of the 'due administration' of the processes of justice and not simply the frustration of justice in the abstract sense." *United States v. Asfeld,* 30 M.J. 917, 926 (A.C.M.R.1990); *see United States v. Guerrero,* 28 M.J. 223, 227 (C.M.A.1989). A reasonably prudent criminal often takes certain measures during the perpetration of the crime, such as wearing a mask or gloves; or after the completion of the crime, such as hiding the loot, to frustrate the police from discovering his or her identity or solving the crime. Such measures to elude detection or capture do not, in and of themselves, amount to obstruction of justice. *See United States v. Gray,* 28 M.J. 858 (A.C.M.R. 1989). The "mere attempt to conceal an offense without more does not establish a specific intent to subvert or corrupt the *administration* of justice." *Asfeld,* 30 M.J. at 926 (footnote omitted)(emphasis in original). Acts of concealment "may or may not amount to obstruction of justice, depending on the circumstances." WHARTON'S CRIMI-

NAL LAW, § 592 (14th ed.1981). A criminal goes beyond mere concealment of his or her crime when, knowing that "an official authority has manifested an official act, inquiry, investigation, or other criminal proceeding with a view toward possible disposition within the administration of justice of the armed forces," he or she takes "some affirmative act by which he or she endeavors to influence, impede, or otherwise obstruct that official action in some given objective manner...." *Gray,* 28 M.J. at 861.

■■■ Even though appellant was being interrogated by a civilian police officer, the allegations were first reported to military authorities and appellant must have known that at least a possible disposition of the allegations would occur within the administration of military justice. During oral argument, appellant's counsel asserted that appellant had faced an unconscionable trilemma of remaining silent and appearing guilty, confessing to the allegations, or lying and risking obstruction of justice charges.[13] It was a difficult choice, but the first two options were not unlawful. Appellant made an informed and deliberate choice of the unlawful option by affirmatively, overtly misleading the police. Appellant, having voluntarily agreed to being interviewed by the police, has no privilege to intentionally deceive them. "Whether or not the predicament of the wrongdoer run to ground tugs at the heart strings, neither the text nor the spirit of the Fifth Amendment confers a privilege to lie." *Brogan,* 522 U.S. 398, 118 S.Ct. 805, 139 L.Ed.2d 830. In addition to denying the allegations, appellant sought to detour the police investigation by giving alternative motives for S.J. to have fabricated the allegations, i.e., she was upset with him for coming home late, or failing to cuddle with her after their consensual intercourse. One of the objectives of the obstruction of justice offense is to avoid

---

12. *See* MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), Part IV, para. 96.

13. The United States Supreme Court recently rejected the notion that this "cruel trilemma" facing a "cornered suspect" creates an "exculpatory no" defense to an 18 U.S.C. § 1001 false statement charge. *Brogan v. United States,* 522 U.S. 398, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998).

The Court aptly noted that "[t]his 'trilemma' is wholly of the guilty suspect's own making, of course. An innocent person will not find himself in a similar quandary (as one commentator has put it, the innocent person lacks even a 'lemma.') ... And even the honest and contrite guilty person will not regard the third prong of the 'trilemma' (the blatant lie) as an available option." *Id.* (citations omitted).

the waste of time, energy, and expense of having the police running down false leads. We are convinced that appellant's affirmative falsehoods were intended to misdirect the police in their investigation and amount to obstruction of justice. Accordingly, we find this assignment of error to be without merit.

The remaining assignments of error, to include those raised personally by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), are without merit. Accordingly, the court affirms only so much of the finding of guilty of Specification 4, Charge VI, as finds that appellant did, at or near Colorado Springs, Colorado, on or about 23 February 1995, wrongfully endeavor to impede an investigation into an allegation of criminal misconduct by stating to Officer Kelley of the Colorado Springs Police Department, with intent to deceive and/or deflect further inquiry into his alleged misconduct, that he had had consensual sex with his wife on 22 February 1995, that there had been no disturbance that night, that he had never broken any of [S.J.'s] bones, never harmed her, nor physically touched her, or words to that effect, which statements were totally false, and were then known by [appellant] to be so false. The remaining findings of guilty are affirmed. Reassessing the sentence on the basis of the error noted and the entire record of trial, and applying the criteria of *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the sentence is affirmed.

Senior Judge TOOMEY and Judge CARTER concur.