**UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Matthew A. ROGERS**
**Electrician's Mate Third Class (E-4), U.S. Coast Guard**

**CGCMG 0361**
**Docket No. 1391**

**21 February 2019**

Military Judge:                             CAPT Benes Z. Aldana, USCG
Appellate Defense Counsel:      LCDR Benjamin M. Robinson, USCG (argued)
                                                    LT Salomee G. Briggs, USCG
Appellate Government Counsel:  LCDR Stephen R. Miros, USCG
                                                    LCDR Emily A. Rose, USCG (argued)
                                                    LT Connor B. Simpson, USCG

**BEFORE**
**McCLELLAND, HAVRANEK & BRUBAKER**
Appellate Military Judges

BRUBAKER, Judge:

A general court-martial of members with enlisted representation convicted Appellant, contrary to his pleas, of two specifications of obstructing justice and one specification of violating 18 U.S.C. § 499 by willfully allowing another person to have his military identification card, in violation of Article 134, Uniform Code of Military Justice (UCMJ).[1] The members sentenced Appellant to reduction to pay grade E-1 and a bad-conduct discharge, which the Convening Authority approved.

Appellant raises the following assignments of error: (1) the identification card specification fails to state an offense under clause 3 of Article 134; (2) the identification card specification fails to state an offense under clause 2 of Article 134; (3) Appellant lacked notice

---

[1] This was a rehearing authorized by the United States Court of Appeals for the Armed Forces after it set aside the original findings and sentence. *United States v. Rogers*, 75 M.J. 270, 275 (C.A.A.F. 2016).

that letting another person temporarily hold his military identification card was criminal conduct; (4) the clause 3 of Article 134 offense alleged in the identification card specification is preempted by the enumerated Article 134 offense of wrongful loan or disposition of a military identification card; (5) evidence that Appellant violated 18 U.S.C. § 499 was legally and factually insufficient; (6) the military judge erred in failing to provide the members with instructions on all the elements of 18 U.S.C. § 499; (7) evidence that Appellant obstructed justice is legally and factually insufficient; (8) the military judge erred in ruling that the two specifications for obstruction of justice were not multiplicious; and (9) the military judge erred in ruling that the two specifications for obstruction of justice were not an unreasonable multiplication of charges. We heard oral argument on the legal sufficiency of the evidence supporting the obstruction of justice convictions.

The Government concedes, and we agree, that the military judge prejudicially erred by failing to instruct on all the elements of 18 U.S.C. § 499. We set aside the identification card conviction on that basis (assignment of error (6)), mooting assignments of error (1) through (5). We conclude that the obstruction of justice convictions are supported by legally and factually sufficient evidence and are neither multiplicious nor an unreasonable multiplication of charges. We thus affirm the obstruction specifications and reassess the sentence.

## Facts

While on temporary duty to attend a class in Portsmouth, Virginia, Appellant and a classmate went to a bar called the Bier Garden before going to a second bar. The classmate returned to their hotel for the evening while Appellant went back to the Bier Garden. There, he observed a highly intoxicated woman who had fallen down and was having difficulty getting back up. Appellant approached and helped her up. He claimed to other patrons that he knew the woman and her husband, but was unable to provide her name.

Because the woman was incoherent, a bartender asked Appellant to hand her the woman's purse. In looking for contact information, she was able to identify the woman as MC. Appellant falsely claimed that he knew MC's husband because they were in the Coast Guard and

taking a class together. He insisted that he would take MC home and make sure she got there safely. The bar staff initially declined, but after Appellant persisted and provided his military identification card as a form of collateral, they relented.

Appellant, however, did not take MC home. He took her to his hotel room, returning to the Bier Garden later that night to retrieve his identification card. When MC awoke in the morning, she did not know how she got to the hotel and had no memory of the previous evening past going to the Bier Garden and ordering a beer. She felt dizzy and had soreness in her rectum and vagina. MC left the hotel, but returned with her husband to try to determine what happened the night before. Hotel employees were ultimately able to link Appellant to the events and called him to say that MC was trying to figure out what happened. Appellant told them that he had met a woman at a bar, let her come back to his room, used her phone to call a taxi, and let her stay on the other bed.

MC subsequently was given a sexual assault forensic examination and the Portsmouth Police Department was notified and opened an investigation. The Portsmouth Police Department, in turn, coordinated with the Coast Guard Investigative Service (CGIS), who opened an investigation in a monitor status, where they continued to coordinate with and assist the Portsmouth Police Department as the lead agency.

A detective from the Portsmouth Police Department interviewed Appellant, who stated that he remembered being at the Bier Garden, then the second bar, but did not remember going back to the Bier Garden and instead, the next thing he remembered was leaving his room at his hotel to smoke a cigarette and finding a woman lying naked in a pool of her own urine. He took her into his room, placed her into the shower, and went back to bed. He then remembered going to the bathroom and returning to find the woman on the other bed masturbating. He stated he then lay in his own bed and she came over and performed oral sex on him. He claimed he again blacked out at that point and remembered nothing further until waking up the next morning with her lying in the adjacent bed.

Seven days later, a different Portsmouth Police Department detective re-interviewed Appellant, this time armed with a search warrant for his phone and a videotape from the Bier Garden. As he watched the video showing him and MC in the bar, he stated he still did not remember being in the Bier Garden at that time and essentially repeated his story from a week earlier.

After local authorities declined to prosecute the case, the Portsmouth Police Department notified CGIS. CGIS's investigation went from a monitor status to an active one and a CGIS special agent interviewed Appellant. After initially repeating his earlier claims, Appellant admitted he had lied to the detectives and in fact remembered going back to the Bier Garden and helping MC up after she had fallen; taking MC back to the hotel; putting her into the spare bed in the room, then lying in his bed before deciding to go smoke a cigarette; investigating noises and discovering her on a stairwell lying in urine; bringing her back to the room and putting her into the shower, then going to bed; after using the bathroom, finding her masturbating on the spare bed; her coming to his bed, climbing on top of him, and performing oral sex on him; him then fingering her vagina for approximately 15 to 20 minutes before falling asleep until the next morning.

### Identification Card Offense

Specification 3 of Charge III, as amended prior to deliberation, alleged Appellant:

> willfully allow[ed] another person . . . to have [Appellant's] military identification card, which was issued by or under the authority of the United States and constitutes a pass or permit issued for [Appellant's] use alone, in violation of 18 U.S. Code Section 499, which conduct was of a nature to bring discredit upon the armed forces.

As this specification expressly alleged a violation of 18 U.S. Code § 499, the military judge was required to instruct the members on all of its elements. Rule for Courts-Martial (R.C.M.) 920(e)(1), Manual for Courts-Martial (MCM), United States (2016 ed.); *United States*

*v. Bailey*, 77 M.J. 11, 13 (C.A.A.F. 2017).  Here, those elements were: (1) that Appellant allowed another person to have his military identification card; (2) that the military identification card constituted a naval, military, or official pass or permit; (3) that the military identification card was issued by or under the authority of the United States; and (4) that the military identification card was issued for Appellant's use alone.  18 U.S. Code § 499.  The instructions omitted the second and fourth elements.

The Government forthrightly concedes this was prejudicial error.  We agree and thus set aside the finding of guilty to Specification 3 of Charge III.

## Obstruction of Justice

Appellant challenges the legal and factual sufficiency of the evidence supporting his convictions for obstructing justice under Article 134, UCMJ.[2]  We review the sufficiency of evidence *de novo*.  Article 66(c), UCMJ; *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002).

Evidence is legally sufficient if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (internal quotation marks and citations omitted).  This is a "very low threshold to sustain a conviction" and we are required to draw "'every reasonable inference from the evidence of record in favor of the prosecution.'"  *Id.* (quoting *United States v. Robinson*, 77 M.J. 294, 298 (C.A.A.F. 2018)).

Evidence is factually sufficient if, after weighing the evidence and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.  *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017).  The phrase "beyond a reasonable doubt," however, "does not mean that the evidence must be free from any conflict or that the trier of fact may not draw reasonable inferences from the evidence presented."  *King*, 78 M.J. at 221.

---

[2] The UCMJ has since been amended to enumerate the offense of obstructing justice under Article 131b.

To support the findings, the Government was required to prove the following essential elements:

(1) That Appellant wrongfully did a certain act—that is, "falsely stating in sum and substance" to civilian detectives that he "only remembered placing his penis in Mrs. MC's mouth before passing out";

(2) That he did so in the case of a certain person against whom he had reason to believe there were or would be criminal proceedings pending;

(3) That the act was done with the intent to influence, impede, or otherwise obstruct the due administration of justice; and

(4) That under the circumstances, his conduct was of a nature to bring discredit upon the armed forces.

MCM (2012 ed.), Pt. IV, ¶ 96.b.

The explanation of the offense in the Manual for Courts-Martial provides that:

[e]xamples of obstruction of justice include wrongfully influencing, intimidating, impeding, or injuring a witness, a person acting on charges under this chapter, an investigating officer under R.C.M. 406, or a party; and by means of bribery, intimidation, misrepresentation, or force or threat of force delaying or preventing communication of information relating to a violation of any criminal statute of the United States to a person authorized by a department, agency, or armed force of the United States to conduct or engage in investigations or prosecutions of such offenses; or endeavoring to do so.

MCM (2012 ed.), Pt. IV, ¶ 96.c.

Appellant challenges the sufficiency of elements (1), (3), and (4). We consider each in turn.

*Element 1: Wrongfully Did a Certain Act*

First, Appellant contends that the evidence failed to prove the act alleged—that Appellant told investigators he "only remembered *placing his penis in MC's mouth* before *passing out*" (emphasis added)—and instead supports only that he told investigators he remembered *MC performing fellatio on him* before *blacking out*. Appellant avers that these differences are significant and that as proven, his acts do not constitute obstruction of justice. We disagree.

The crux of the allegations in these specifications was that Appellant affirmatively represented to investigators that he remembered nothing beyond a certain point in time when, in fact, he remembered salient events. Specifically, he stated that he remembered nothing after oral sex until the next morning but later admitted that he had lied and knew that immediately after oral sex, he inserted his fingers into MC's vagina. In this context, how Appellant's penis ended up in MC's mouth and whether his alleged memory lapse was due to pass-out or blackout were immaterial to his liability for obstruction of justice. For similar reasons, we conclude that although these specifications could have been crafted with more precision, any variance between the pleadings and proof did not substantially prejudice Appellant. *See United States v. Marshall*, 67 M.J. 418, 420 (C.A.A.F. 2009).

Second, Appellant alleges there was insufficient evidence of the wrongfulness of the proven acts. An act is wrongful if "done without legal justification or with some sinister purpose." *United States v. Barner*, 56 M.J. 131, 136 (C.A.A.F. 2001). Here, there was sufficient evidence that Appellant deliberately made false statements to criminal investigators with no legal justification or excuse for doing so. His acts were, therefore, wrongful.

*Element 3: Intent to Influence, Impede, or Otherwise Obstruct Justice*

In assessing this element, we reach perhaps the most important question in this case: If the alleged act is a suspect lying during an interrogation, what, if any, impact must the suspect intend for his lie to have in order for it to constitute obstruction of justice under Article 134, UCMJ? Appellant posits that the false statement must be intended not just to corruptly influence the outcome of the investigation, but specifically to steer investigators in the wrong direction or to divert investigative resources. We disagree.

Although there are relatively few cases on point, military cases have consistently held that a suspect's false statements during a criminal interrogation can, under the right circumstances, constitute obstruction of justice under Article 134, UCMJ. *See, e.g., United States v. Arriaga*, 49 M.J. 9, 9–10 (C.A.A.F. 1998); *United States v. Jenkins*, 48 M.J. 594, 601–02 (A.Ct.Crim.App. 1998). Appellant, however, correctly points out that the courts in each of

these cases found evidence that the accused intended his false statement not just to deceive investigators, but also to divert investigative resources in some fashion. In *Arriaga*, for instance, the Court noted that the accused lied to agents not only "in an attempt to prevent the capture of himself and his cohorts," but as a means of sending them on a "wild goose chase" looking for contraband at made-up locations. *Arriaga*, 49 M.J. at 10. In *Jenkins*, the Court found that in addition to denying the allegations, the accused "sought to detour the police investigation by giving alternative motives" for the alleged victim fabricating allegations. *Jenkins*, 48 M.J. at 601. The Court reasoned, "One of the objectives of the obstruction of justice offense is to avoid the waste of time, energy, and expense of having the police running down false leads. We are convinced that appellant's affirmative falsehoods were intended to misdirect the police in their investigation and amount to obstruction of justice." *Id.* at 601–02.

Here, in contrast, there is no evidence that Appellant specifically intended to send investigators on a "wild goose chase" or otherwise divert investigative resources. This leaves us with a novel question: to constitute obstruction of justice*, must* a lie to investigators be specifically intended to misdirect investigative resources? We hold that it does not. The false statement (like any wrongful act) must merely be intended "to influence, impede or otherwise obstruct justice"—a phrase with broader meaning than urged by Appellant.

In reaching this conclusion, we emphasize several points. First, at issue in both *Arriaga* and *Jenkins* was not just the intent element, but whether the acts were prejudicial to good order and discipline. *Arriaga*, 49 M.J. at 11; *Jenkins*, 48 M.J. at 601. Appellant's conviction, on the other hand, was for service-discrediting conduct. This makes a difference: a direct, palpable impact on a military investigation may be relevant to whether conduct was prejudicial to good order and discipline while being unnecessary to prove whether it was of a service-discrediting nature.

Second, the *mens rea* element of this offense requires the act to be intended "to influence, impede *or* otherwise obstruct justice." MCM (2012 ed.), Pt. IV, ¶ 96.b.(3) (emphasis added). Nothing in this broadly-worded phrase implies that if the act is lying to investigators, then only

an intent to misdirect investigative resources—in other words, impede the investigation—will suffice.

Appellant, however, directs our attention to the MCM's explanation of the offense, noting that the list of examples of obstructing justice only mentions misrepresentation when it is used as a means of "delaying or preventing communication of information" about a criminal violation. MCM (2012 ed.), Pt. IV, ¶ 96.c. We find two flaws with this: (1) The explanation Appellant refers to is merely persuasive and "illustrative, not exclusive," *United States v. Ashby*, 68 M.J. 108, 118 (C.A.A.F. 2009); (2) The evidence supports a reasonable inference that Appellant made his false statements for precisely that purpose: to delay or prevent communication of information about what happened after oral sex. We again see nothing in the explanation that narrows the offense to require a specific intent to misdirect investigative resources.

We also reject Appellant's contention that the Supreme Court's interpretation of federal obstruction statutes narrows the reach of Article 134. True, the Court in *Marinello v. United States*, 138 S. Ct. 1101, 1109–10 (2018) and *United States v. Aguilar*, 515 U.S. 593, 600 (1995) interpreted language similar to Article 134's "intent to influence, impede, or otherwise obstruct the due administration of justice" more narrowly than military courts have. But first, nothing in the Supreme Court's decisions weakens the premise that a false statement, even from a suspect, can be obstructive. *See, e.g., Aguilar*, 515 U.S. at 601 n.2. The issue, instead, is the Court's reading of the phrase "due administration of justice" to require "an intent to influence *judicial or grand jury proceedings*; it is not enough that there be an intent to influence some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Aguilar*, 515 U.S. at 599 (emphasis added).

Second, the United States Court of Appeals for the Armed Forces has definitively held that *Aguilar*'s restriction of "due administration of justice" to judicial or grand jury proceedings does not apply to Article 134: "Obstruction of justice punishable at military law under Article 134 is delineated in our case law and explained by the President in the Manual for Courts–Martial in a substantially different way." *Arriaga*, 49 M.J. at 11. *See also United States v.*

*Williams*, 29 M.J. 41, 42 (C.M.A. 1989) (noting "the long-standing precedent that an offense of obstruction of justice under the first or second clause of Article 134 of the Code exists independent from other Federal obstruction-of-justice statutes"). Military courts have, instead, long held that obstructive acts may occur at an investigative or even pre-investigative phase as long as the accused "'had reason to believe there were or *would be* criminal proceedings pending' against himself or some other person." *United States v. Athey*, 34 M.J. 44, 48 (C.M.A. 1992) (quoting MCM (1984 ed.), Pt. IV, ¶ 96.b.) (emphasis in original).

Appellant also appears to urge us to adopt a sliding standard depending on whether a person making a false statement to investigators is a suspect or merely a witness. We decline to do so. Material, false statements to investigators corrupt the processes of justice equally whether uttered by a witness or a suspect. True, as Appellant points out, investigators are not *entitled* to incriminating statements from suspects, but nor is a suspect who elects not to exercise his Fifth Amendment privilege and elects instead to answer questions entitled to lie. *Brogan v. United States*, 522 U.S. 398, 404, (1998) (rejecting "exculpatory no" defense to crime of making false statements to federal investigators) ("Whether or not the predicament of the wrongdoer run to ground tugs at the heartstrings, neither the text nor the spirit of the Fifth Amendment confers a privilege to lie."). This remains true for a "big" lie sending investigators on a wild goose chase or a "little" lie falsely denying memory of salient events. *Id.* at 402 ("Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very *purpose* of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function."). As long as the lie is intended to corruptly influence the investigation and meets the remaining elements, it is obstruction of justice under Article 134.

Granted, as an offense under Article 134, the President's description of the elements and explanation of the offense are persuasive, not binding, authority and merely indicate "circumstances in which the elements of Article 134, UCMJ, could be met." *United States v. Jones*, 68 M.J. 465, 471–72 (C.A.A.F. 2010). We nevertheless conclude that Appellant had fair notice that his act of deliberately and affirmatively misrepresenting to criminal investigators that he remembered nothing after oral sex until the next morning was proscribed as long as it was intended to influence, impede, or otherwise obstruct justice—even if not necessarily intended

specifically to impede the investigation by misdirecting investigative resources. *See Parker v. Levy,* 417 U.S. 733, 755–56 (1974); *Ashby*, 68 M.J. at 118.

We also reject Appellant's contention that his act of lying to investigators was taken merely to avoid detection rather than to obstruct justice. He is correct that "merely committing a crime in such a way as to avoid detection does not automatically trigger liability for the additional charge of obstructing justice." *United States v. Finsel*, 36 M.J. 441, 443 (C.M.A. 1993). We determine the line between detection and obstruction of justice "on a case-by-case basis, considering the facts and circumstances surrounding the alleged obstruction and the time of its occurrence with respect to the administration of justice." *Id.* While "the line separating the end of the principal offense from the beginning of obstruction of justice is often difficult to discern," *id.*, it is not difficult here. The alleged commission of the offense was over, Appellant had been detected, and when questioned, he had the choice to answer truthfully at the risk of incriminating himself, to remain silent as was his privilege, or to lie. His choice to lie was not an act taken merely to avoid detection, but one intended to obstruct the investigators from establishing whether or not he was involved in a crime.

We turn to Appellant's contention that the evidence was insufficient that he obstructed *military* justice as opposed to a state or local proceeding. We question the premise that the target of obstruction must be military justice. While Appellant is correct that examples in the MCM and a number of older cases focus on the impact on military justice, nothing in either the MCM or in caselaw expressly limits the offense to obstruction of military proceedings. Indeed, a number of cases have applied Article 134 to obstruction of state or foreign proceedings. *See, e.g., Ashby*, 68 M.J. at 113; *United States v. Smith*, 34 M.J. 319, 322 (C.M.A. 1992) (calling contention that interfering with state court proceeding could not constitute military offense of obstructing justice "not well taken." Instead, "the recognized impact of the servicemember's conduct on the military and its mission, not its technical characterization, is the touchstone for applying Article 134."); *Jenkins,* 48 M.J. at 601.

But irrespective of whether there must be a nexus to military justice proceedings to sustain a conviction under Article 134, we conclude there was a sufficient one here. When the

Portsmouth Police Department opened its investigation, CGIS opened a concurrent one for monitoring, coordination, and assistance. The matters under investigation were ultimately passed to CGIS as the investigative lead and tried by military authorities. This was not unforeseeable by Appellant. While interviewing him, the civilian detective made repeated references to the Coast Guard, including the impact that the matter under investigation could have on his Coast Guard career, that she would pass along any information she obtained to the Coast Guard, and that the Coast Guard would have to decide what to do with it. "Thus, like *Jones* [20 M.J. 38 (C.M.A. 1985)] and *Guerrero* [28 M.J. 223 (C.M.A. 1989)], it can be said that the impact of the charged conduct on a later, but nonetheless probable, military investigation brought it within the intended scope of Article 134." *Smith*, 34 M.J. at 322.

*Element 4: Service-Discrediting Conduct*

Finally, Appellant asserts there was insufficient evidence to support the terminal element of the offense—here, that his conduct was of a nature to bring discredit upon the armed forces. We disagree.

"'Discredit' means to injure the reputation of. This clause of Article 134 makes punishable conduct which has a tendency to bring the service into disrepute or which tends to lower it in public esteem." MCM (2012 ed.), Pt. IV, ¶ 60.c.(3). Here, the civilian detectives were well aware of Appellant's Coast Guard affiliation. In fact, during his second interview, he was in uniform. Irrespective of how common it may be for criminal suspects to lie during interrogations, we have no doubt that, under the circumstances, Appellant's attempt to influence or obstruct a criminal inquiry by making false statements had a tendency to lower the public's esteem for the service.

In sum, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational finder of fact could have found all elements of obstruction of justice under Article 134, UCMJ, beyond a reasonable doubt. Further, having made allowances for not having personally observed the witnesses, we are ourselves convinced beyond a reasonable doubt. We thus find the evidence legally and factually sufficient.

**Multiplicity**

Appellant contends his dual convictions for repeating the same false statement to different investigators on separate dates are multiplicious. We disagree.

The test for this species of multiplicity is whether, applying the intended unit of prosecution under Article 134's obstruction of justice, Appellant committed one punishable act or two. *United States v. Forrester*, 76 M.J. 479, 485 (C.A.A.F. 2017). "Unless a statutory intent to permit multiple punishments is stated 'clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses[.]'" *United States v. Szentmiklosi*, 55 M.J. 487, 491 (C.A.A.F. 2001) (alteration in original) (quoting *Bell v. United States*, 349 U.S 81, 84 (1955)). On the other hand, if obstruction of justice is a "distinct or discrete-act offense, separate convictions are allowed in accordance with the number of discrete acts." *United States v. Neblock*, 45 M.J. 191, 197 (C.A.A.F. 1996).

To determine the intent of the Article 134 offense of obstructing justice, we consider the Presidentially-listed elements as persuasive authority. *Forrester*, 76 M.J. at 485–86. We apply the rules of statutory construction, starting with the language of the text. *Id.* The second element of obstructing justice—that "the accused wrongfully did *a certain act*," MCM (2012 ed.), Pt. IV, ¶ 96.b.(1) (emphasis added)—evinces an intent that the unit of prosecution is each obstructive act. *Guerrero*, though cited by Appellant, only bolsters this conclusion. There, the Court held that a single act of simultaneously asking multiple witnesses to lie amounted to only one offense—in other words, the unit of prosecution was each act committed, not each witness influenced. *Guerrero*, 28 M.J. at 227.

This case, instead, is closer to *Barner*, 56 M.J. at 137, where the Court held that two obstruction specifications alleging separate instances against different individuals were not multiplicious. Likewise here: even though Appellant repeated the same false statement with the same intent and in the course of the same investigation, each statement was a separate act on separate dates to different people. Each act is punishable as a separate offense and the two specifications are not multiplicious.

**Unreasonable Multiplication of Charges**

In the alternative to multiplicity, Appellant urges that the military judge erred by denying his motion to merge the two obstruction specifications as an unreasonable multiplication of charges. Reviewing for an abuse of discretion, *United States v. Pauling*, 60 M.J. 91, 95 (C.A.A.F. 2004), we disagree.

The prohibition against unreasonable multiplication of charges is codified in Rule for Courts-Martial 307(c)(4): "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." We consider the following non-exhaustive list of factors when determining if the Government has unreasonably multiplied charges:

> (1) Did the accused object at trial that there was an unreasonable multiplication of charges and/or specifications?;
> (2) Is each charge and specification aimed at distinctly separate criminal acts?;
> (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?;
> (4) Does the number of charges and specifications unfairly increase the appellant's punitive exposure?; and
> (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*United States v. Quiroz*, 55 M.J. 334, 338-39 (C.A.A.F. 2001) (citation omitted).

Appellant did object at trial, but the remaining factors weigh against him. Although Appellant repeated the same false statement, he did so on two different dates to two different detectives. These were two distinctly separate criminal acts. While the analysis might be different if the two statements had at least arguably been in a single transaction (such as in the course of a single interrogation), here, a week passed between Appellant's two false statements. We thus do not find that the specifications misrepresent or exaggerate his criminality or unfairly increase his punitive exposure.[3] Finally, we find no evidence that the Government overreached

---

[3] In fact, although not clear from the record, it appears that the military judge effectively merged the two obstruction specifications for sentencing purposes. He instructed the members that the overall maximum punishment included eight years of confinement. Having been expressly litigated, it was clear that the identification card offense accounted for three of those. The remaining five years is the maximum for one obstruction offense. MCM (2012 ed.), Pt. IV, ¶ 96.e.

by charging the two separate incidents separately. We conclude that the military judge did not abuse his discretion by denying Appellant's motion.

## Sentence Reassessment

We next consider the impact of setting aside the identification card offense on the sentence.

Courts of Criminal Appeal have broad discretion to reassess sentences. *United States v. Winckelmann,* 73 M.J. 11, 15 (C.A.A.F. 2013). But we may only do so if we can reliably and confidently determine that, absent the error, the sentence would have been at least of a certain magnitude. *United States v. Buber,* 62 M.J. 476, 479 (C.A.A.F. 2006); *United States v. Harris,* 53 M.J. 86, 88 (C.A.A.F. 2000). If we cannot do this, we must order a rehearing. *Harris,* 53 M.J. at 88. A reassessed sentence must not only "be purged of prejudicial error[,]" but "also must be 'appropriate' for the offense involved." *United States v. Sales,* 22 M.J. 305, 308 (C.M.A. 1986).

We apply the totality of the circumstances of each case to make sentence reassessment determinations, guided by the following "illustrative, but not dispositive, points of analysis":

(1) Whether there has been a dramatic change in the penalty landscape or exposure.
(2) Whether sentencing was by members or a military judge alone. We are more likely to be certain of what sentence a military judge would have imposed as opposed to members.
(3) Whether the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, similarly, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses.
(4) Whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial.

*Winckelmann,* 73 M.J. at 15–16.

Under the totality of the circumstances, we conclude that we can reassess the sentence. The change to the penalty landscape is modest. Even assuming the military judge merged the two obstruction specifications for sentencing purposes, the maximum confinement is reduced from eight years to five. The members adjudged no confinement, so this reduction would have

had no impact. Although sentencing was by members and references to Appellant's alleged misuse of his identification card would have been rendered inadmissible, the remaining offenses are of a type with which we have experience and familiarity and are able to reliably determine what sentence would have been imposed.

We determine that the sentence, purged of error, would have included at least a bad-conduct discharge. The identification card offense played a significant role in the Government's sentencing case, but so too did the obstruction offenses. Appellant obstructed justice on one occasion, had a week to reflect on that, then came back and obstructed justice again. We believe that this is significant and continues to merit a punitive discharge. We are convinced the members would have sentenced Appellant at least to a bad-conduct discharge and that this is an appropriate sentence.

### Decision

The finding of guilty to Specification 3 of Charge III is set aside and the specification is dismissed. A rehearing is not authorized. Only so much of the sentence as provides for a bad-conduct discharge is approved. The findings and sentence, as modified, are affirmed.

Chief Judge McCLELLAND and Judge HAVRANEK concur.



For the Court,


L. I. McClelland
Chief Judge